**Peter J. BRENNAN, Secretary of Labor, United States Department of Labor,**

v.

**Robert N. PARNHAM, Individually and doing business as Bob's Auto Repair.**

**Civ. A. No. 72–674.**

United States District Court,
W. D. Pennsylvania.

Nov. 20, 1973.

Richard Soltan, Asst. Regional Sol., U. S. Dept. of Labor, Philadelphia, Pa., for plaintiff.

William F. Caruthers, Greensburg, Pa., for defendant.

## OPINION AND ORDER

SNYDER, District Judge.

The Secretary of Labor, pursuant to the provisions of Section 17 of the Fair Labor Standards Act, Act of June 25, 1938, C. 676, 52 Stat. 1060, as amended, 29 U.S.C. Section 201 et seq., seeks to enjoin defendant from violating the overtime provisions of the Act, from continuing withholding of overtime compensation due employees, from violating the provisions of the Act relating to record keeping, and to enjoin defendant from violating the child labor provision of the Act.[1] After careful consideration of all the testimony adduced during the hearing in this matter, the Court makes the following:

## I. FINDINGS OF FACT

1. The defendant, Robert Parnham, resides at Sheridan Terrace, Irwin,

1. Pertinent statutory provisions relevant to this matter are:

"29 U.S.C. § 207. *Maximum hours*

(a)(1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed;
. . . ."

"29 U.S.C. § 211. *Investigations, inspections, records and homework regulations*

(c) Every employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder."

"29 U.S.C. § 212. *Child labor provisions*

(c) No employer shall employ any oppressive child labor in commerce or in the production of goods for commerce or in any enterprise engaged in commerce or in the production of goods for commerce."

"29 U.S.C. § 213. *Exemptions*

(a) The provisions of section 206 (except subsection (d) in the case of paragraph (1) of this subsection) and section 207 of this title shall not apply with respect to—

(1) any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary, subject to the provisions of the Administrative Procedure Act, except that an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities); or

(2) any employee employed by any retail or service establishment (except an establishment or employee engaged in laundering, cleaning, or repairing clothing or fabrics or an establishment engaged in the operation of a hospital, institution, or school described in section 203(s)(4) of this title), [if] more than 50 per centum of such establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, and such establishment is not in an enterprise described in section 203(s) of this title or such establishment has an annual dollar volume of sales which is less than $250,000 (exclusive of excise taxes at the retail level which are separately stated). A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry;
. . . ."

Westmoreland County, Commonwealth of Pennsylvania, and operates an auto body repair service at two locations, one located in the Borough of Irwin and the other in the Borough of North Irwin, in Westmoreland County, Pennsylvania, all within the jurisdiction of this Court.

2. Defendant's employees, as listed on the attached Schedule A, operate tow trucks, receive emergency service calls, strip abandoned automobiles preparatory to salvage, in accordance with a contract with the Pennsylvania Turnpike Commission granting Robert Parnham exclusive status as the authorized service agent in District No. 3, between Mileage Posts 50 and 75, on the Pennsylvania Turnpike. Also, a portion of the defendant's business was attributable to customers who sought out defendant's garage apart from those encountering difficulties on the Turnpike.

3. Defendant had a fleet account arrangement with approximately ten major carriers which provided that accidents or mechanical breakdowns occurring within Turnpike District No. 3 would be serviced by the defendant and such services would be charged directly to the home offices of the carriers.

4. Defendant also services automobiles whose owners were members of the American Automobile Association (hereinafter referred to as A.A.A.). Half the towing costs and all the service charges in such cases were charged directly to A.A.A., the automobile owner paying the portion of the charge not covered. Defendant similarly performed services not charged to the motorist for vehicles under lease from rental agencies such as Hertz, Avis, U–Haul, etc.

5. Defendant also did substantial repairs to a fleet of cabs owned by Underhill Taxi Cab, Inc., a wholly owned corporation of the defendant, Robert Parnham. Such repairs were rendered on a daily basis and the value of such repairs was not included in the annual dollar volume of business of Bob's Auto Repair.

6. Part of the contract with the Pennsylvania Turnpike Commission required defendant to remove abandoned vehicles from the Turnpike and these abandoned vehicles were towed to the defendant's garage where they would be stripped by defendant's employees for usable parts. The usable parts were used to repair either cars towed from the Turnpike or defendant's taxis. After the abandoned automobiles were stripped, defendant would secure title to the automobiles and then sold the auto bodies to junk men where they would be compacted and transferred to a processing facility owned by, among others, United States Steel to be reclaimed as salvaged iron.

7. The defendant also sold truck tires to motor carriers.

8. The employees, as listed on the attached schedule, except Albert Booth and Arthur Stout, regularly and recurringly during each week for which violations of the Act have been alleged, engaged in one or more of the above activities.

9. Each of defendant's employees worked in excess of forty hours during each and every workweek that they were employed with the defendant.

10. Defendant failed to pay any employee time and one-half of the regular rate for hours worked in excess of forty hours in any workweek.

11. The defendant's employees who were engaged in towing wrecked and disabled vehicles from the Pennsylvania Turnpike, were essentially engaged in removal of obstructions to the flow of interstate traffic and/or engaged in commerce within the meaning of the Act.

12. Although the employees' work was not exclusively devoted to the towing of vehicles from interstate highways, the towing activities were part of an industry whose cumulative effect upon interstate commerce was substantial.

13. The only two employees who did not operate tow trucks were Albert

Booth and Arthur Stout. Booth performed services directly related to the defendant's towing service and helped to keep the interstate flow of traffic unobstructed, and his service was a part of the overall service offered under the Pennsylvania Turnpike Commission Contract. Stout regularly engaged in the removal of parts from wrecked and abandoned automobiles, stored on defendant's premises, and such stripping of usable parts is part of the production of goods for commerce—salvaged ferrous metals.

14. John Kamarinski devoted, at most, 10 percent of his time to managerial duties and the defendant has thus failed to show that he is entitled to an exemption as an executive employee.

15. Defendant employed one William Lehman as a tow truck operator before Lehman's eighteenth birthday.

16. Defendant failed to maintain adequate, accurate records as required by Section 11(c) of the Act and the regulations published pursuant thereto as found at 29 C.F.R. 516.

17. The sum of $7,667.00 as computed by the Secretary represents a conservative estimate of overtime due to unknown employees.

## II. DISCUSSION.

### A. COMMERCE INVOLVEMENT

It seems very clear since the Supreme Court case of Overstreet v. Northshore Corp., 318 U.S. 125, 128–129, 63 S.Ct. 494, 87 L.Ed. 656 (1943), that we are involved in the application of the "practical test" as to that which is indispensable to interstate movement. In the *Overstreet* case, the Supreme Court was required to consider the application of the Fair Labor Standards Act to persons employed in the operations of a toll bridge over which persons and goods passed in interstate commerce. In an opinion by Mr. Justice Murphy, the Court set forth as follows:

"Our starting point is respondent's concession that no question of constitutional power is involved, but only the ascertainment of Congressional intent, that is, did Congress mean to include employees such as petitioners within the Act. In arriving at that intent it must be remembered that Congress did not choose to exert its power to the full by regulating industries and occupations which affect interstate commerce. See A. B. Kirschbaum Co. v. Walling, 316 U.S. 517, 522, 523, 62 S.Ct. 1116, 1119, 1120, 86 L.Ed. 1638, 1646, 1647; Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (decided January 18, 1943). Respondent contends that petitioners are in this category, that their activities are local and at most only affect commerce. But the policy of Congressional abnegation with respect to occupations affecting commerce is no reason for narrowly circumscribing the phrase 'engaged in commerce.' We said in the Jacksonville Paper Co. Case, *supra*, 'It is clear that the purpose of the Act was to extend federal control in this field throughout the farthest reaches of the channels of interstate commerce.' And in determining what constitutes 'commerce' or 'engaged in commerce' we are guided by practical considerations. Jacksonville Paper Co. Case, *supra*, and see also Shanks v. Delaware, L. & W. R. Co., 239 U.S. 556, 558, 36 S.Ct. 188, 189, 60 L.Ed. 436, 438, L.R.A.1916C, 797, dealing with what will shortly be pointed out as a similar question in the coverage of the Federal Employers' Liability Act.

A practical test of what 'engaged in interstate commerce' means has been evolved in cases arising under the Federal Employers' Liability Act (45 U.S.C.A. §§ 51, 54, 56, 60 et seq.) which, before the [August 11] 1939 amendment (see 53 Stat. 1404, c. 685), applied only where injury was suffered while the carrier was engaging in interstate or foreign commerce and the injured employee was employed by the carrier 'in such commerce.' [April

22, 1908] 35 Stat. 65, c. 149. In determining the reach of that phrase, the case of Pedersen v. Delaware, L. & W. R. Co., 229 U.S. 146, 33 S. Ct. 648, 57 L.Ed. 1125, Ann.Cas.1914C, 153, 3 N.C.C.A. 779, held that an employee who was injured while carrying bolts to be used in repairing a railroad bridge over which interstate trains passed was engaged in interstate commerce within the meaning of the Liability Act. It was pointed out that tracks and bridges were indispensable to interstate commerce and 'that the work of keeping such instrumentalities in a proper state of repair while thus used is so closely related to such commerce as to be in practice and in legal contemplation a part of it.' (Citations omitted)

We think that practical test should govern here. Vehicular roads and bridges are as indispensable to the interstate movement of persons and goods as railroad tracks and bridges are to interstate transportation by rail. If they are used by persons and goods passing between the various States, they are instrumentalities of interstate commerce. Cf. Covington & C. Bridge Co. v. Kentucky, 154 U.S. 204, 218, 14 S.Ct. 1087, 1092, 38 L.Ed. 962, 968, 4 Inters.Com.Rep. 649. Those persons who are engaged in maintaining and repairing such facilities should be considered as 'engaged in commerce' even as was the bolt carrying employee in the *Pedersen Case*, 229 U.S. 146, 33 S.Ct. 648, 57 L.Ed. 1125, Ann.Cas.1914C, 153, 3 N.C.C.A. 779, supra, because without their services these instrumentalities would not be open to the passage of goods and persons across state lines. And the same is true of operational employees whose work is just as closely related to the interstate movement." (Citations omitted) (Emphasis added)

In Gray v. Swanney-McDonald, Inc., 436 F.2d 652 (9th Cir. 1971) cert. den. 402 U.S. 995, 91 S.Ct. 2173, 29 L.Ed.2d 161, tow truck drivers appealed from the dismissal of their action against Swanney-McDonald, Inc. seeking to recover overtime compensation under the Fair Labor Standards Act. In an opinion by Circuit Judge Hufstedler the following is set forth (at page 653):

"We first take up appellee's contention that the appellants were not engaged in interstate commerce and thus were not subject to the Act. Swanney-McDonald, Inc., is a California corporation having its principal place of business in Los Angeles where it operates an automotive tow service garage providing tow service and emergency road service for disabled motor vehicles in the greater Los Angeles area. Appellants were the drivers who did the actual towing and road servicing. Among the areas they serviced were a number of Interstate and U.S. Highways making up the freeway system of Los Angeles. On rare occasions calls were made out of this area, and on even rarer occasions calls were made out of state. The total number of such calls constituted less than one percent of appellee's business.

The servicing of traffic moving on interstate highways is a significant part of interstate commerce, but, appellee argues, its employees spent so little time doing that work that the interstate aspect of their duties was *de minimis*. The district court thought not, and we agree. The provision of towing and road services for the national highway system is essential to the free flow of traffic on that system. The fact that such services are a small part of appellee's business renders them no less important to interstate commerce. Even if appellee's contribution to interstate commerce was, by itself, quite small, we cannot ignore the cumulative effect that the many small companies in appellee's position have upon commerce between the states. By regularly servicing vehicles on the Interstate and U.S. Highways, appellee has become part of an industry the cumulative effect

of which upon interstate commerce is substantial. Congress intended the Fair Labor Standards Act to cover such an industry, which necessarily means that the Act covers each and every member of that industry. The only way to regulate the whole is to regulate each discrete part. The fact that any given, or every given, company's contacts with interstate commerce are extremely small is irrelevant. (Dickenson v. United States (9th Cir. 1966) 353 F.2d 389. *See also* Southern California Freight Lines v. McKeown (9th Cir.) 148 F.2d 890, cert. denied (1945) 326 U.S. 736, 66 S.Ct. 46, 90 L.Ed. 439.)

■■■ Beyond the requirement that the employees of the business in question be engaged in interstate commerce, the Fair Labor Standards Act contains a specific exemption for 'retail or service establishments' which meet certain requirements as to the volume and source of their business. Retail or service establishments are defined as any establishment '75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry * * *.' 29 U. S.C. § 213(a)(2). Appellants do not challenge appellee's right to an exemption if the appellee can qualify as a retail or service establishment. They contend that the district court's implied finding that appellee was such an establishment was clearly erroneous because appellee did not prove that no more than 25 percent of its business was for resale. The issue turns on the nature of the business done for the National Auto Club and for local automobile repair shops.

During the years in question, appellee towed cars for members of the National Auto Club and charged the Club directly. The Club did not bill its members directly for that charge, but absorbed it as part of its overhead. Similarly, appellee towed disabled vehicles to repair shops that did not in turn charge the vehicle's owner directly, but absorbed the cost as overhead. Appellee seizes upon this business practice to argue that these transactions are not sale of services for resale. The district court apparently adopted that argument; we do not. Particularly persuasive is the decision of the Fourth Circuit in Mitchell v. Sherry Corine Corp., 264 F.2d 831, cert. denied (1959) 360 U.S. 934, 79 S.Ct. 1453, 3 L.Ed.2d 1546. The issue was whether or not the sale of meals to airlines was not for resale because the airlines did not directly charge the passengers for the meals. The court held that the meals were for resale, emphasizing the economic reality that the cost of the meals was reflected in the price paid for the ticket. Appellee's situation is identical: The cost to the Auto Club and to the repair shops of appellee's towing services was not a gift to their customers; the cost was passed on in the form of increased membership fees and repair rates and resold as surely as if it had been part of an itemized bill. Therefore, unless appellee can establish on remand that these items constituted 25 per cent or less of the dollar volume of his business, it is entitled to no exemption from coverage of the Fair Labor Standards Act." (Emphasis added)

(See Footnote 2 from opinion set forth below as Footnote 2)

2. "Although the district court did not make an explicit finding to this effect, such a finding is implicit in its finding that appellee did 75 percent of his business not for resale. In establishing the percentage of business done not for resale in order to gain an exempt status the burden of proof is on the party claiming the exemption. Idaho Sheet Metal Works v. Wirtz, 383 U.S. 190, 86 S. Ct. 737, 15 L.Ed.2d 694 (1966). In this case, appellee introduced no evidence as to the percentage of his dollar volume attributable to these sales. Therefore, the district court could not have found that appellee had met its burden unless the court found that these sales were not for resale."

Chief Judge Matthes in Gilreath v. Daniel Funeral Home, Inc., 421 F.2d 504, 510 (8th Cir. 1970) succinctly stated the correct law as follows:

"Coverage under the Fair Labor Standards Act, however, is dependent upon the character of the activities of each individual employee, not upon the nature of the employer's business."

In Chambers Construction Company v. Mitchell, 233 F.2d 717, 720 (8th Cir. 1956) the Court held:.

"Appellants assert, correctly, that 'the nature of the employer's business is not determinative, the application of the Act depending upon the character of employees' activities and not the nature of the employer's business'."

The Administrator's Interpretative Bulletin (29 C.F.R. 779.103) provides, in pertinent parts as follows:

"Employees are 'engaged in commerce' within the meaning of the Act when they are performing work involving or related to the movement of persons or things (whether tangibles or intangibles, and including information and intelligence) among the several States or between any State and any place outside thereof. * * * The courts have made it clear that this includes every employee employed in the channels of such commerce or in activities so closely related to this commerce, as to be considered a part of it as a practical matter."

It is well established that the interpretative regulations issued by the Secretary of Labor are generally valid and binding as a reasonable exercise of delegated authority. Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944); Hearnsberger v. Gillespie, 435 F.2d 926 (8th Cir. 1970).

In this case there were only two employees who did not regularly operate tow trucks, i. e., Albert Booth and Arthur Stout. The evidence clearly established that Booth regularly answered telephone calls relating to the defendant's towing service and, certainly, his services were just as necessary and an integral part of defendant's business as the mechanics who operated the towing vehicles. While Arthur Stout neither answered calls nor operated the tow truck, he was involved in removing parts from the wrecked and abandoned vehicles stored on the defendant's premises and was, thus, clearly connected with the production of goods for commerce.

29 U.S.C. § 203(j) provides:

" 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State."

The stripping of the usable parts from abandoned and/or disabled vehicles was part of the production of goods for commerce (salvaged metals), and after the removal of the parts the remaining car bodies were crushed and then sold to steel mills for recycling. Mitchell v. Jaffe, 261 F.2d 883 (5th Cir. 1958). Thus, Arthur Stout was also engaged in commerce.

### B.  EXEMPTIONS NOT ESTABLISHED

As noted in Footnote 1, 29 U.S.C. § 213(a)(2) exempting retail establishments from the provisions of Section 207 of the Act, prescribes four conditions which must be fulfilled to qualify for an exemption from the overtime payment requirement of the Act. Briefly stated these four conditions are:

1. The services in question must be recognized as retail services in the particular industry which itself must have a retail concept;

2. Seventy-five percent of the annual dollar volume of sales of goods or services must not be for resale;

3. More than fifty percent of the establishment's annual dollar volume of sales of goods and services must be made within the state wherein the establishment is located; and

4. The establishment must not be an enterprise within the meaning of 29 U. S.C. § 203(s) and must not have an annual dollar volume of sales more than $250,000.

■■ It is well established that the burden of proving an exemption from the Act rests upon the defendant. Idaho Sheet Metal Works v. Wirtz, 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966); Mitchell v. Kroger Company, 248 F.2d 935 (8th Cir. 1957). Exemptions are to be narrowly construed against employers seeking to assert them. Mitchell v. Kentucky Finance Co., 359 U.S. 290, 295, 79 S.Ct. 756, 3 L. Ed.2d 815 (1959); Gilreath v. Daniel Funeral Home, Inc., *supra*. Exempt status will be limited to those situations that plainly and unmistakably come within the terms and the spirit of 29 U. S.C. § 213's exemption provisions. Arnold v. Kanowsky, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960).

(1) *Defendant's Retail Classification*

■ The scope of the exemption in Section 213(a)(2) depends upon the recognition that the defendant's business provides a retail service in a particular industry which in and of itself must have a retail concept. Courts have repeatedly confined Section 213(a)(2) exemptions to businesses which are "traditionally regarded as retail" and which are epitomized by the corner grocer, department stores, drug stores, and the like. As examples of businesses not considered as being within the retail scope are the following: Idaho Metal Works v. Wirtz, 383 U.S. 190, 86 S.Ct. 737, 15 L. Ed.2d 694 (1966) (a producer of potato processing equipment); Mitchell v. Kentucky Finance Co., 359 U.S. 290, 295, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959) (a small loan company); Schultz v. Nalle Clinic, 444 F.2d 17 (4th Cir. 1971), cert. denied 404 U.S. 938, 92 S.Ct. 269, 30 L.

Ed.2d 250 (1971) (a medical clinic); Goldberg v. Sorvas, 294 F.2d 841 (3rd Cir. 1961) (a shopping service which investigated and reported on the efficiency of retail store employees); Goldberg v. Roberts, 291 F.2d 532 (9th Cir. 1961) (a letter shop which provided addressing and mailing services).

The defendant has contended that the Secretary of Labor has, by regulation, admitted the retail nature of the defendant's business. This reliance on the regulation is misguided. In 29 C.F.R., the regulation provides in part as follows: "Section, 779.320 Partial list of establishments whose sales or service may be recognized as retail . . . . Automobile dealers' establishments . . . . Automobile repair shops . . . ." However, in Section 779.321, it is set forth as follows:

(a) Only those sales or services to which the retail concept applies may be recognized as retail sales of goods or services for purposes of the exemption. The fact that the particular establishment may have a concept of retailability, in that it makes sales of types which may be recognized as retail, is not determinative unless the requisite portion of its annual dollar volume is derived from particular sales of its goods and services which have a concept of retailability. Thus, *the mere fact that an establishment is of a type noted in § 779.320 does not mean that any particular sales of such establishment are within the retail concept.* As to each particular sale of goods or services, an initial question that must be answered is whether the sales of goods or services of the particular type involved can ever be recognized as retail. The Supreme Court in Wirtz v. Steepleton General Tire Co., 383 U.S. 190, 86 S.Ct. 737, 15 L. Ed.2d 694, confirmed the Department's position that (1) the concept of 'retailability' must apply to particular sales of the establishment, as well as the establishment or business as a whole, and (2) even as to the establishment whose sales are 'variegated'

and include retail sales, that nonetheless classification of particular sales of goods or services as ever coming within the concept of retailability must be made. Sales of some particular types of goods or services may be decisively classified as nonretail on the ground that such particular types of goods or services cannot ever qualify as retail whatever the terms of sale, regardless of the industry usage or classification.

(b) An establishment is, therefore, not automatically exempt upon a finding that it is of the type to which the retail concept of selling or servicing is applicable; it must meet all the tests specified in the Act in order to qualify for exemption. Thus, for example, an establishment may be engaged in repairing household refrigerators, and in addition it may be selling and repairing manufacturing machinery for manufacturing establishments. The retail concept does not apply to the latter activities. In such case, the exemption will not apply if the annual dollar volume derived from the selling and servicing of such machinery, and from any other sales and services which are not recognized as retail sales or services, and from sales of goods or services for resale exceeds 25 percent of the establishment's total annual dollar volume of sales of goods or services." (Emphasis added)

In the instant situation, the testimony shows that the customers did not seek out the retail garage. Rather, as the employees' testimony established, the defendant's business was focused on a service provided under the Turnpike contract. While the motorist had the right to refuse assistance, this right was of a rather dubious nature since no other service garage was permitted to patrol defendant's assigned section of the Turnpike and defendant's service was the only one immediately available. Nor is there any other method of contacting service garages short of soliciting aid from passing motorists. In addition, the services provided are regulated by the Turnpike Commission as to the rates which could be charged for service calls and towing. The contract also set forth the area of operation, required special equipment, special employee uniforms, daily service reports, emergency procedures and operating goals, all to insure that a qualified service was provided to the Commission and the State Police to maintain the uninterrupted flow of traffic on the interstate system. Cf. Snelling v. O. K. Service Garage, Inc., 311 F. Supp. 842 (E.D.Ky.1970) (operation of a towing and repair service which responded to towing requests from motorists and police—not within the retail concept); Voyles v. Murray, 297 F. Supp. 1288 (N.D.Texas 1969) (a towing case where over 75 percent of the calls for towing service were made by the individual owners—within retail concept).

Thus, it would seem that the defendant has failed to meet his burden to show the first requirement of the first test set forth above, that the services must be recognized as retail services in the particular industry. Furthermore, under the defendant's contention that the conditional retail classification of automobile repair garages contained in Section 779.320, even if it were to be accepted, which it is not, he has still failed to meet the second requirement that the particular services must be recognized as retail services. The defendant has not demonstrated, and we do not see how he could demonstrate, that the services provided, for example, to motor carriers, to taxi cabs and to A.A.A. members are recognized as retail in character. Accordingly, defendant has failed to meet the burden of plainly and unmistakably showing that its services were recognized as retail in an industry which itself has a retail concept and, thus, must be denied the exemption. Hodgson v. N. G. Kallas Company, 480 F.2d 994 (6th Cir. 1973).

(2) *Defendant has not established annual dollar volume exemption.*

■ It is just as clear that the defendant has failed to demonstrate plain-

ly and unmistakably that at least 75 percent of its sales or services were not for resale. In, Gray v. Swanney-McDonald, Inc., 436 F.2d 652 (9th Cir. 1971), cert. denied 402 U.S. 995, 91 S.Ct. 2173, 29 L.Ed.2d 161, the defendant's employees provided towing and emergency road service in and around the Los Angeles freeways to members of automobile club and the club was billed directly therefor. In its opinion the Court held (at page 654):

> "During the years in question, appellee towed cars for members of the National Auto Club and charged the Club directly. The Club did not bill its members directly for that charge, but absorbed it as part of its overhead. * * * Appellee seizes upon this business practice to argue that these transactions are not sale of services for resale. * * * (U)nless appellee can establish . . . that these items constituted 25 percent or less of the dollar volume of his business, it is entitled to no exemption from coverage of the Fair Labor Standards Act."

The defendant offered no convincing evidence that these items constituted 25 percent or less of the dollar volume of his business. Accordingly, we can only hold that the defendant has failed to meet its burden of plainly and unmistakably showing that it falls within each of the terms of the exemptions. Goldberg v. Furman Beauty Supply, Inc., 300 F.2d 16 (3rd Cir. 1962).

■ It will be recalled that there were also contracts between defendant and various motor carriers for repair of commercial vehicles on a fleet arrangement. Such a sale of services to motor carriers is not within the resale concept of Section 13(a)(2). Thus, in Boutell v. Walling, 327 U.S. 463, 66 S.Ct. 631, 90 L.Ed. 786 (1946), mechanics engaged in greasing, repairing, servicing and maintaining equipment employed in interstate motor transportation were held to be engaged in interstate commerce within the meaning of the Fair Labor Standards Act. Furthermore, they were specifically held to be not within the exemption for employees "engaged in any retail or service establishment, the greater part of whose selling or servicing is intrastate commerce", particularly where the servicing of the transportation company's equipment was substantially all of the business done by the service company. In Hodgson v. Pipeline Oil Co., 69 L.C. ¶ 32,791 (W.D.Ky. 1972) (not yet officially reported), the Court held that sales to motor carriers of repairs and other services, equipment or other goods or facilities, by establishments commonly referred to as "truck stops" were nonretail, and also held:

> "Sales of diesel fuel for truck fuel and the repair and servicing of trucks used in over-the-road commercial transportation, including parts and accessories for such vehicles, are specialized goods and services 'which can never be soled at retail . . . . whatever the terms of the sale.' Idaho Sheet Metal Works, Inc. v. Wirtz, supra; Wirtz v. Steepleton General Tire Company, Inc., supra. Also see 29 C.F.R. 779.371(c)(7)."

With regard to the A.A.A. sales in this case, defendant made no creditible showing of the percentage of the annual dollar volume attributed to truck services. The evidence indicated that approximately 50 percent of the defendant's annual dollar volume of business stemmed from these truck services. Thus, defendant failed to demonstrate the 75 percent of annual dollar volume of sales of goods and services for resale required.

## C. DEFENDANT'S ACTIVITIES INCLUDED PROCESSING.

■ It is too clear for argument that any manufacturing or processing on the premises of an establishment which might otherwise be considered as engaged in retail services, defeats the application of Section 13(a)(2) for an exemption. Lunnel v. Kanowsky, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960). In Schultz v. Jack Smith's Automatic Transmission Serv., Inc., 422 F.

2d 104 (4th Cir. 1970), the employer's business was reconditioning transmissions and installing them in automobiles. This was held to be manufacturing or processing within the meaning of the Fair Labor Standards Act and was not a "retail or service establishment", exempt from the Act. Judge Sobeloff, in his opinion, cogently stated as follows (at page 107):

> "In Guess v. Montague, 140 F.2d 500 (4th Cir. 1943), the defendant 'operated a machinery repair shop, in which he repaired machinery for his customers, sold repair parts and rebuilt and sold second-hand machinery which he had purchased.' Rejecting the contention that this constituted a 'service establishment' within the meaning of § 13(a)(2), the court, speaking through Judge Parker, said 'nor would the work done in rebuilding and reconditioning second-hand machinery for sale by defendant fall within the exemption, which does not extend to manufacturing or processing goods for sale * * *.' Likewise, in Walling v. Roland Electric Co., 146 F.2d 745, 749 (4th Cir. 1945), aff'd, 326 U.S. 657, 66 S.Ct. 413, 90 L.Ed. 383 (1946), the court again held that the business of 'reconditioning and sale of second hand motors' was 'clearly not that of a retail or service establishment within the meaning of the Act'."
> (Emphasis added)
> (See Footnote 8 of opinion set forth below as Footnote 3)

This then is another reason for holding that the defendant has completely failed to show that its activities fall within the percentage test. Accordingly, defendant's claim for an exemption provided for under either Section 13(a)(2) and/or in Section 13(a)(4) must be denied.

▇▇▇ Defendant has also contended that certain of its employees are exempt.

Previously we discussed the allegations with respect to Albert Booth and Arthur Stout. In both instances, the record clearly fails to establish that these employees were at the management level. As to John Kamarinski, the evidence was that 90 percent of his time was devoted to manual labor not related to any supervisory duties. Accordingly, Kamarinski does not meet the test prescribed in 29 C.F.R. 541.1(a) which requires that the employee's "primary duty consists of the management of the enterprise in which he is engaged . . . ." Applying the primary duty test of Section 541.103, the employee spent much less than the 50 percent of his time required to be management. Brennan v. Carl Roessler, Incorporated, 361 F.Supp. 229 (D.Conn.1973). The Court, therefore, finds that the defendant has failed to show by the preponderance of the evidence that the Kamarinski position satisfies the elements of the exemption and that Kamarinski is not to be exempt from the overtime provisions of the Act.

## III. THE SECRETARY'S DETERMINATION OF OVERTIME MUST BE ADOPTED

▇▇▇ In light of the foregoing discussion, it is clear that the Secretary must recover on his claim for back overtime wages if he has carried his burden to show the number of overtime hours worked. The burden is on the employer to keep accurate time records. 29 U.S.C. § 211(c); 29 C.F.R. § 516.2(a)(7); Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687, 66 S.Ct. 1187, 1192, 90 L. Ed. 1515 (1946). In a case such as this, where the employer has failed to keep records of the time worked, the Court may make the determination of this issue if there is information available, such as the reasonable and creditable estimates of the employees themselves.

---

3. "In both *Montague* and *Roland Electric, supra*, the court made the further finding that the sales by these companies were 'not sales to consumers and not retail sales' to bring them within exemption coverage. However, it is the determination that the nature of the defendants' businesses was manufacturing or processing that is legally relevant for us."

Brennan v. Carl Roessler, Incorporated, 361 F.Supp. 229 (D.Conn.1973).

██ In the instant case, the employees, pursuant to a stipulation entered into by counsel, testified as to their hours of work and rates of pay. This testimony was supplemented by the testimony of Compliance Officer Swanson, who had investigated the defendant's business. The defendant presented no contrary evidence regarding the hours worked by these employees. The Court substantially credits the testimony given by the employees and accordingly accepts the Secretary's calculation of such amounts as contained in Schedule A which is attached hereto. The Court, therefore, finds that such amounts are due from the defendant to each employee. The Court further accepts the testimony and calculations of Compliance Officer Swanson in regard to the figure of $7,667.00 due to unknown employees. In addition, the defendant shall pay interest at the rate of 6 percent on this award from the median date of the violations of the overtime provisions. Hodgson v. Corning Glass Works, 330 F.Supp. 46, 51 (W.D.N.Y.1971) affirmed as modified 474 F.2d 226 (2nd Cir. 1973); Hodgson v. American Can Company, 440 F.2d 916, 922 (8th Cir. 1971).

## IV. CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter in this action pursuant to the provisions of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. § 201 et seq.) herein referred to as "the Act".

2. The majority of defendant's employees were required to drive tow trucks, to clear and remove wrecks and disabled vehicles from the interstate highway and, accordingly, engaged in commerce within the meaning of the Act because their regular towing activities cleared the channels of interstate commerce.

3. Defendant's employees who regularly and recurringly received and forwarded service calls to tow truck operators were also engaged in commerce.

4. Defendant's employees who regularly and recurringly stripped parts from automobiles which were subsequently recycled for interstate iron and steel enterprises were engaged in the production of goods for commerce within the meaning of the Act.

5. Defendant's activities in servicing commercial vehicles and clearing the Pennsylvania Turnpike pursuant to contracts with the Pennsylvania Turnpike Commission are so closely related to interstate transportation that the defendant's towing and repair service is an integral part of the transportation industry. Accordingly, defendant fails to meet the requirement of Section 13(a)(2) that it is engaged in an industry which has a traditional retail concept since there is no retail concept in the transportation industry.

6. Defendant has failed to show the percentage of its annual dollar volume of business that was attributable to sales and services for resale and has, thus, failed to meet its burden of plainly and unmistakably showing that at least 75 percent of its annual dollar volume is attributable to sales not for resale.

7. Defendant has also failed to meet each of the tests prescribed in 29 C.F.R. 541, which relate to the exemption of executive personnel and, thus, has failed to meet the requirements of this exemption as well.

8. Having failed to meet the tests for exemption as provided in Section 13(a)(1) and Section 13(a)(2) of the Act, defendant's failure to pay its employees time and a half the regular rate of pay for hours worked in excess of forty hours constitutes a violation of Section 7 of the Act.

9. Defendant has failed to maintain employee records in accordance with the requirements of Section 11(c) of the Act and 29 C.F.R. 516.

10. Defendant has admitted a violation of Section 12(c) of the Act by employing a minor as a tow truck operator during portions of 1971. Injunctive restraint must be applied to this type of violation.

11. As a result of the violations of Section 7 of the Act, underpayments of overtime compensation are due the employees listed in attached Schedule A* in the amounts shown thereon. This will also include the amount of $7,667.00 set forth in Schedule A as due to unknown employees.

12. Based on the Findings of Fact and Conclusions of Law contained herein, plaintiff is entitled to injunctive relief enjoining violations of Sections 7 and 15(a)(2), Sections 11(c) and 15 (a)(5), Sections 12(c) and 15(a)(4), and enjoining the continued withholding of overtime underpayments due and owing defendant's employees.

13. Plaintiff is entitled to interest at 6 percent per annum on the amounts of back wages found due in the abovementioned Schedule from the median dates of withholding from each person until payment is made.

An appropriate order will be entered.

* Deleted for purposes of publication.