Anna Mae RAU, Plaintiff,

v.

**DARLING'S DRUG STORE, INC.,**
Defendant.

Civ. A. No. 74–184.

United States District Court,
W. D. Pennsylvania.

Jan. 31, 1975.

Henry E. Rae, Jr., Brandt, McManus, Brandt & Malone, Pittsburgh, Pa., for plaintiff.

Murray S. Love, Sikov & Love, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

SNYDER, District Judge.

This is a proceeding brought under the provisions of Section 7 of the Fair Labor Standards Act, 29 U.S.C. § 207, in which the Plaintiff seeks to recover overtime compensation for the years 1972 and 1973. The Defendant contends that the Plaintiff was employed in an "executive capacity" and is thus exempt from those provisions. On December 12, 1974, this Court heard the matter in a Non-Jury Trial.

## FINDINGS OF FACT

1. The Plaintiff, Anna Mae Rau (Rau), is forty-one years of age and has been employed continuously at Darling's Drug Store, Inc. (Darling's) since 1953.

2. Darling's is a corporation whose stock was owned solely by Nathan Darling until the time of his death in 1973.

3. Darling operated a neighborhood type retail drug store, located in the Uptown Section of the City of Pittsburgh, Allegheny County, Pennsylvania, on a seven days a week, fifty-two weeks a year basis. In 1972 the store hours were 7:30 A.M. to 8:00 P.M., but that closing time was first modified to 7:00 P.M. and subsequently changed to 6:00 P.M.

4. In the years in question, Darling's did business through five departments and in the following amounts:

|  | Fiscal Year Ending 3–31–72 | Fiscal Year Ending 3–31–73 |
|---|---|---|
| PRESCRIPTIONS | $175,426.88 (48%) | $160,167.47 (46%) |
| DRUGS & SUNDRIES | 44,838.32 (12%) | 52,058.65 (15%) |
| CANDY & TOBACCO | 61,034.50 (17%) | 65,335.96 (19%) |
| COSMETICS | 13,353.97 ( 4%) | 9,275.82 ( 3%) |
| FOUNTAIN | 69,608.09 (19%) | 59,121.91 (17%) |

5. Although at the time she was hired Rau's duties were essentially those of a sales clerk, as time went on she was given more and more functions to perform by Nathan Darling.

6. The contract of employment was intended to compensate the Plaintiff on a straight time basis for all hours she was called upon to work in a workweek (regardless of, how many), and Rau clearly understood and agreed to these terms.

7. During the years in question, Rau had nothing to do with the Prescription Department which was managed by Harold Rosenberg, a registered pharmacist, who supervised apprentice pharmacists who were hired by Nathan Darling. All wages and working hours were also fixed by Nathan Darling.

8. In 1972 and 1973, Rau helped out in both the Candy and Tobacco Department, where two persons were employed, and in the Fountain Department, where three persons were employed, if, for any reason, one of these employees was not available. She did supervise these Departments.

9. Rau was the sole sales clerk for the Drug & Sundries and the Cosmetics Departments, and handled the stocking of shelves and the marking of merchandise. Rau did all of the sales work in these Departments except for an occasional helping hand from Mary Darling, the wife of the owner. Her work in these Departments occupied fifty to eighty percent of Rau's working hours.

10. Rau's other duties included:

Unpacking new merchandise; marking price tags on new merchandise; collection of employee's time slips and reporting time records by telephone to the accountant's office; opening the store each morning at 6:30 A.M.; closing the store each night and leaving the store at 8:30 P.M. or later; helping out in other Departments when they were busy; making out bills for the monthly accounts receivable; and decorating the store windows.

11. By 1972 Rau was generally in charge of the "front of the store", that is, everything other than the Prescription Department. Even so, more than fifty percent of her time was taken up with sales clerk work.

12. Nathan Darling determined who should be hired and fired. These decisions were frequently made upon Rau's recommendations, except as to the employees of the Prescription Department.

13. Nathan Darling fixed the salaries and wages for all employees, fixed the sales price of all goods sold, and was consulted on all decisions that were to be made with respect to store policy.

14. During 1972 Rau's base wage was $120.00 per week, plus a $20.00 cash payment which, although not included in her wage statement, was given to her by Nathan Darling on a weekly basis and was part of her regular base wage, making her weekly wage $140.00.

15. During 1973 Rau's base wage was $120.00 per week, plus a $30.00 cash payment which, although not included in her wage statement, was given to her by Nathan Darling on a weekly basis and was part of her regular base wage, making her weekly wage $150.00.

16. Rau averaged twelve hours per day on a seven day per workweek basis for the one hundred and four weeks comprising the 1972-1973 period.

17. Rau was not paid any overtime wages for any work in excess of forty hours per week during 1972 and 1973. Other benefits provided by her employer, such as food and merchandise discounts, were in the nature of gifts and not based upon the number of hours worked. These were not in the nature of compensation such as would be included in the determination of the "regular rate", nor were they premiums to be credited toward overtime compensation.

18. The hourly rate of pay or the "regular rate" paid to Rau during the fiscal year 1972 was $1.67, calculated at twelve hours per day for seven days per

week or eighty-four hours per week, on the weekly rate of $140.00.

19. The hourly rate of pay or the "regular rate" paid to Rau during the fiscal year 1973 was $1.79, calculated at twelve hours per day for seven days per week or eighty-four hours per week, on the weekly rate of $150.00.

20. All business checks were signed by either Nathan or Mary Darling, and no other employee had authority to sign checks.

21. Payrolls were prepared by P. A. Love & Company, the business accountant, from information furnished by Rau, and all accounts payable were computed and paid by the accountant.

22. Rau was not employed in an executive or administrative capacity which would be exempt from the overtime provisions of the Fair Labor Standards Act.

## DISCUSSION

The Fair Labor Standards Act, 29 U. S.C. § 207, sets forth:

"207. *Maximum hours*

"(a)(1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

The term "regular rate" is defined by the Act to "include all remuneration for employment paid to, or on behalf of, the employee" (Section 207(e)), but does not include sums paid for gifts, or for occasional periods when no work is performed due to vacation, holiday, illness or other similar causes. There are various other exclusions which are not here applicable.

It is further provided (Sec. 213(a)) that overtime pay at time and one-half does not apply with respect to:

"(1) any employee employed in a bona fide executive, administrative, or professional capacity . . . except that an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his work week which he devotes to activities not directly or closely related to the performance of executive or administrative activities, *if less than 40 per centum of his hours worked in the work week are devoted to such activities* . . . ." (Emphasis added)

"(2) any employee employed by any retail or service establishment . . . if more than 50 per centum of such establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, and such establishment is not in an enterprise described in section 203(s) of this title or such establishment has an annual dollar volume of sales which is less than $250,000 . . . A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry; . . . ."

In this case the parties agree that Rau worked in excess of forty hours per week, fifty-two weeks per year, and in a business which is not otherwise exempt, for which she would have to be paid overtime for hours in excess of forty hours at the rate of time and one-half, unless she occupied an "executive or administrative" position.

■ In resolving this issue, we must first apply the well known precept that "exemptions are to be narrowly construed against the *employers* seeking to assert them and their application limited

to those establishments plainly and unmistakably within their terms and spirit." (Emphasis added) Arnold v. Kanowsky, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960); Brennan v. Bill Kirk's Volkswagen, 497 F.2d 892 (4th Cir. 1974); Hodgson v. Elk Garden Corporation, 482 F.2d 529 (4th Cir. 1973); Brennan v. Parnham, 366 F.Supp. 1014 (W.D.Pa.1973).

Plaintiff here contends that the exemption from overtime under the term "bona fide executive" or "administrative capacity" while not defined in the Act, is limited by the regulations promulgated by the Secretary of Labor.[1]

29 C.F.R. § 541.1 establishes six specific criteria, all of which *must be met* before an employee can be considered exempt as an "executive" employee. These criteria will be discussed *seriatim*:

(a) *Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof.*

While there are not departments and sections in a family type drug store, there were essentially two primary sales areas here: one involved drugs, and the other involved all other products which were for sale. There was thus a recognized department which was subject to management, and which, in fact, produced over fifty percent of the revenues of the drug store. The testimony established that Rau was, in fact, in charge of all of the sales of the store, outside of the Prescription Department, and she must be held to come within the first criteria because she was an employee whose primary duty consisted of the management of a customarily recognized department or subdivision of the enterprise.

(b) *Who customarily & regularly directs the work of two or more other employees therein.*

The testimony established that Rau did direct the work of all store employees with the exception of the Prescription Department, and since the working staff regularly consisted of twenty employees outside of the Prescription Department, she fulfills this definition. There was testimony that the Fountain Department had a regular Manager, and was under the control and supervision of that person but, as will hereinafter be shown, Rau also had control and supervision over this area insofar as the hiring and firing of personnel was concerned. In any event, she did "customarily and regularly direct the work of two or more other employees therein".

(c) *Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight.*

Rau acknowledged that she falls within this classification and meets this requirement for while she did not hire or fire on her own authority, she testified that she did make recommendations with respect thereto to the owner, Nathan Darling, and that he generally accepted these recommendations. This testimony by Rau was corroborated by others.

(d) *Who customarily and regularly exercises discretionary powers.*

While Rau was a saleswoman, helped out at the Fountain, and did a great deal of other work around the drug store, it is clear that she did exercise discretionary power in all areas of the store, except the Prescription Department. In

---

1. "Although courts are not bound by interpretative bulletins, see 29 C.F.R. § 779.8, they provide us with guidance simply because they reflect the position of those most experienced with the application of the Act. *See* Foremost Dairies, Inc. v. Wirtz, 381 F. 2d 653 (5th Cir. 1967), cert. denied sub nom. Home Town Foods, Inc. v. Wirtz, 390 U.S. 946, 88 S.Ct. 1031, 19 L.Ed.2d 1134 (1968)." Brennan v. Great American Discount and Credit Co., Inc., 477 F.2d 292, 296 (5th Cir. 1973).

1972 and 1973, Rau operated "the front of the store" as if it were her own, with the exception that the final decisions on hiring and firing of personnel and on wage determinations were made by Nathan Darling. Mrs. Mary Darling did not attempt to exercise control over Rau even though she spent much time at the store after her husband's death. Rau, therefore, must be held to fulfill this requirement of "executive" capacity.

> (e) *Who does not devote . . . as much as 40 percent, of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of this section.*

The effect of this requirement is that before the employer can establish an exemption, it must be shown that the employee does not devote more than forty percent of her time to activities other than those directly or closely related to managerial duties. Rau was employed as a sales clerk and the testimony was that in the applicable period she devoted more than fifty percent of her time to work generally related to sales. In addition, when she was not selling, she was taking orders at the fountain or selling cigarettes at the tobacco counter. None of these activities were of a managerial nature or directly or closely related thereto, so as to fall within that classification. Rau clearly did not spend sixty percent of her time at managerial tasks or those associated with managerial duties. The Defendant here has failed to show any specific number of hours that Rau was engaged in managerial duties or activities directly and closely related to such duties. Rau does not, therefore, meet the requirements of this subsection.

> (f) *Who is compensated for his services on a salary basis at a rate of not less than $125 per week . . . ., exclusive of board, lodging, or other facilities.*

Rau was paid a salary of $140.00 per week during 1972, exclusive of board, lodging, or other facilities and, thus, met the requirements of this subsection. As noted in our Findings of Fact, her base wage was $120.00 per week plus a regular cash payment of $20.00 weekly, making her weekly wages $140.00. During 1973, she received a weekly wage of $150.00, exclusive of board, lodging, or other facilities, which consisted of a base wage of $120.00 plus a regular cash payment of $30.00. It is apparent that Rau did meet this requirement during the period involved in this case.

The Regulations then go on to establish, in Section 541.2, five specific criteria for the determination of an "administrative" employee.[2] Again, all five criteria *must be met* before an exemption will be granted. Since these requirements are essentially the same as those contained in Section 541.1, which the Court has previously commented upon in some detail, extended discussion is not required. These criteria are:

> (a) *Whose primary duty consists of . . . the performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers.*

As previously outlined, Rau's duties consisted in large measure of manual work as is befitting a clerk in such an enterprise. (*See,* Findings of Fact 7–10), and thus, she does not come within this classification.

> (b) *Who customarily and regularly exercises discretion and independent judgment.*

This criteria is met for it is clear that Rau exercised discretionary powers in

---

2. The distinction between "executive" and "administrative" employees is, in many situations, an indistinct one as the definitions of the two terms are to some extent overlapping. Therefore, in this case, we feel it necessary to discuss both as they may or may not apply to the Plaintiff. *See generally,* Legg v. Rock Products Manufacturing Corporation, 309 F.2d 172 (10th Cir. 1962); *see* Annot., 40 A.L.R.2d 332, 338–339 (1955).

all areas of the store, other than the Prescription Department.[3]

(c) *Who regularly and directly assists a proprietor* . . .

Clearly, the evidence showed, and there is no dispute, that Rau "regularly and directly" assisted Nathan Darling, the proprietor, while he was alive, and then Mrs. Darling, after his death in 1973. She, therefore, qualifies under this requirement.

(d) *Who, in the case of an employee of a retail or service establishment, does not devote as much as 40 percent, of his hours worked in the workweek to activities which are not directly or closely related to the performance of the work described in paragraphs (a) through (c) of this section.*

As discussed previously, Rau devoted more than fifty percent of her time to the work of a sales clerk during the period in question here, and, therefore, does not qualify for an exemption as an "administrative" employee.[4]

(e) *Who is compensated for his services on a salary or fee basis at a rate of not less than $125 per week . . . exclusive of board, lodging, or other facilities.*

This requirement is identical to that of Section 541.1(f), and the discussion stated previously need not be restated, as the same rationale applies here.

In addition, the Secretary of Labor in setting forth interpretations of exempt and non-exempt duties (Executive, Administrative, Professional and Outside Salesmen Exemptions Under The Fair Labor Standards Act)[5] has stated that non-exempt duties include the making of sales, replenishing stock, returning stock to shelves, and performing the same kind of work as that performed by employees under his supervision. It is clear from the evidence in this case that Rau made sales, replenished stock and returned stock to the store shelves. Further, there can be no question that she performed all of the duties performed by the other employees, and she did not occupy an exalted or exempt status in the store. A review of Rau's work duties during an average week shows that she spent most of her time on non-exempt type duties and, certainly, fifty percent or more of her work hours were spent on routine clerical and sales duties.

■ From the preceding, it is clear that Rau did not meet the tests established by the Fair Labor Standards Act for exemption from its provisions as either an "executive" or an "administrative" employee. As was previously noted, in order to qualify under Sections 541.1 or 541.2, an employee must meet *all* of the criteria of that Section, and the evidence does not show Rau qualified under either of them. The evidence does, however, show Rau's work duties were of the nature and type described by the Secretary of Labor's publication, Executive, Administrative, Professional and Outside Salesmen Exemptions Under The Fair Labor Standards Act, as being non-exempt.

The Plaintiff here was an extremely hard working individual who conscientiously applied herself to the benefit of her employer. We believe it was the intention of Congress that persons of this type should be entitled to the protection of the Fair Labor Standards Act and, therefore, entitled to an award for damages when this protection is not afforded by their employer, through the withholding of overtime compensation payments as in this case.

## COMPENSATION FOR OVERTIME MUST BE COMPUTED AT ONE–HALF THE REGULAR RATE

■ Darling correctly states that where an employee's salary is intended

---

3. See discussion relative to Subsection (d) criteria for determining "executive" capacity on Page 881 of this Opinion.

4. See discussion relative to Subsection (e) criteria for determining "executive" capacity on Page 882 of this Opinion.

5. Plaintiff's Exhibit 2, Page 3.

to compensate him for the total number of hours worked, the hourly rate should be multiplied by one-half, rather than one and one-half, to determine the compensation due for any hours worked in excess of forty, because the employee has been compensated already on a straight time basis for the hours worked in addition to the forty hour base. 29 C.F.R. § 778.114; Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682, 1689 (1942); Yellow Transit Freight Lines, Inc. v. Balven, 320 F.2d 495 (8th Cir. 1963); Hayes v. Bill Haley and his Comets, Inc., 274 F.Supp. 34 (E.D.Pa.1967).

In order for the above method to be used in the computation of overtime, however, certain conditions must be met, as set forth in 29 C.F.R. § 778.114:

"§ 778.114 *Fixed salary for fluctuating hours.*

(a) An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. *Where there is a clear mutual understanding of the parties that the fixed salary is compensation* (apart from overtime premiums) *for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest,* and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay. Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week. *Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement.*

\* \* \* \* \* \*

(c) *The 'fluctuating workweek' method of overtime payment may not be used unless the salary is sufficiently large to assure that no workweek will be worked in which the employee's average hourly earnings from the salary fall below the minimum hourly wage rate applicable under the Act,* and unless the employee clearly understands that the salary covers whatever hours the job may demand in a particular workweek and the employer pays the salary even though the workweek is one in which a full schedule of hours is not worked. Typically, such salaries are paid to employees who do not customarily work a regular schedule of hours and are in amounts agreed on by the parties as adequate straight-time compensation for long workweeks as well as short ones, under the circumstances of the employment as a whole. Where all the legal prerequisites for use of the 'fluctuating workweek' method of overtime payment are present, the Act, in requiring that 'not less than' the prescribed premium of 50 percent for overtime hours worked be paid, does not prohibit paying more. On the other hand, *where all the facts indicate that an employee is being paid for his overtime hours at a rate no greater than that which he receives for nonovertime hours, compliance with the Act cannot be rested on any application of the fluctuating work-*

*week overtime formula."* (Emphasis added)

In this case, the minimum wage was $1.60 per hour during the period in question. Rau's remuneration, computed to an hourly rate, was $1.67 per hour in 1972 ($140 ÷ 84 hours), and $1.79 per hour in 1973 ($150 ÷ 84 hours), as noted in Finding of Fact Nos. 17 and 18. Under the Contract Rau's duties included opening and closing the store, and many other functions which required her presence at the store for many hours in excess of forty. In view of these considerations, the Employment Contract necessarily was intended to compensate Rau on a straight time basis for whatever number of hours she was called upon to work in any workweek, and her testimony at trial demonstrated that this was her clear understanding of the terms of the Contract.

■ Therefore, since Rau has already been paid on a straight time basis, under the Contract terms, for the hours she worked in excess of forty, and because her hourly rate exceeded the minimum wage standard then in effect, she is entitled only to overtime compensation at one-half the regular rate.

## PLAINTIFF HAS NOT RECEIVED ANY EXTRA COMPENSATION WHICH MUST BE CHARGED AS A CREDIT AGAINST AN AWARD OF OVERTIME COMPENSATION

Darling further contends that implicitly, if not orally, the parties here had agreed that Rau could expect to receive, in addition to her weekly salary, an unlimited merchandise discount of 40%, a 50% discount on all of her meals, and what was called a "Christmas Bonus" of $900.00 which was paid to her during each of the two years with which we are here concerned, and that these benefits were premiums paid for overtime work.

29 U.S.C. § 207(h) provides that "[e]xtra compensation paid as described in paragraphs (5)–(7) of subsection (e) of this section shall be creditable toward overtime compensation payable pursuant to this section."

29 U.S.C. § 207(e)(5) applies to "extra compensation provided by a premium rate paid for certain hours worked . . . in excess of . . . the employees normal working hours or regular working hours". This section does not cover the situation here because the Employment Contract was for all hours worked.

29 U.S.C. § 207(e)(6) applies to "extra compensation provided by a premium rate paid for work by the employee on Saturdays, Sundays, holidays, or regular days of rest . . . ." Clearly, Rau received no such premiums for work on these days and the record is devoid of any evidence produced by the Defendant to support any other conclusion.

29 U.S.C. § 207(e)(7) pertains to "extra compensation provided by a premium rate paid to the employee, in pursuance of an applicable employment contract . . . for work outside of the hours established in good faith by the contract . . . ." Again, since the Plaintiff's Employment Contract was for all hours actually worked, there can not exist any hours worked outside the scope of that Contract for which extra compensation was paid.

■ Therefore, since there was no extra compensation of the types specifically described in § 207(e)(3), (5) through (7) of the Act, there can be no credit against an overtime award as is provided for under § 207(h). The "extras" which Rau received were not required nor provided for in the Employment Contract. They were paid by Darling as desired, but were not required.

The Defendant's third contention is that even if Rau is entitled to overtime compensation, since she has already received "extra compensation" (the $20 per week cash payment in 1972 and the $30 payment in 1973), these weekly payments should be charged as a credit against the overtime awarded. This argument, however, overlooks the provisions of the Act as interpreted by the

Secretary of Labor in 29 C.F.R. § 778.-310, which provides in pertinent part:

> "A premium in the form of a lump sum which is paid for work performed during overtime hours without regard to the number of overtime hours worked *does not qualify as an overtime premium* even though the amount of money may be equal to or greater than the sum owed on a per-hour basis . . . . The reason for this is clear. *If the rule were otherwise, an employer desiring to pay an employee a fixed salary regardless of the number of hours worked in excess of the applicable maximum hours standard could merely label as overtime pay a fixed portion of such salary sufficient to take care of compensation for the maximum number of hours that would be worked.* The Congressional purpose to effectuate a maximum hours standard by placing a penalty upon the performance of excessive overtime work would thus be defeated. For this reason, where extra compensation is paid in the form of a lump sum for work performed in overtime hours, *it must be included in the regular rate and may not be credited against statutory overtime compensation due.*" (Emphasis added)

■ We believe Darling's position is identical with that covered by the above Regulation and, thus, the weekly lump sum payments must be treated as a part of the compensation calculable within the regular rate, but are excludable from overtime compensation, and cannot, therefore, be charged as a credit against an award for the Plaintiff.

## COMPENSATORY DAMAGES

During 1972, Rau worked forty four hours of overtime per week, for a yearly total of 2288 overtime hours, and her regular pay rate was $1.67 per hour [($120 salary + $20 lump sum) ÷ 84 hours)]. Therefore, overtime compensation is due to the Plaintiff in the sum of $1,921.92 [2288 hours × (½ × $1.67)], for the year 1972.

During 1973, Rau also worked forty four overtime hours per week, for a total of 2288 overtime hours, and her regular pay rate was $1.79 per hour [($120 salary + $30 lump sum) ÷ 84 hours)]. The overtime compensation due to the Plaintiff for 1973, therefore, amounts to $2,059.20 [2288 hours × (½ × $1.79)].

The total overtime compensation due and owing to the Plaintiff for the period in question is $3,981.12.

## LIQUIDATED DAMAGES

29 U.S.C. § 216(b) [6] provides that in addition to liability for unpaid overtime compensation, the employer shall be liable for "an additional equal amount as liquidated damages". While the language of this Section is clear and mandatory in its context, the Court has the power to exercise its discretion in the matter of such damages by virtue of 29 U.S.C. § 260 [7] which makes allowances for an employer who shows to the

---

6. 29 U.S.C. § 216(b) provides in pertinent part:

"Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. . . . The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action. . . ."

7. 29 U.S.C. § 260 provides in pertinent part:

"In any action commenced prior to or on or after May 14, 1947 to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216(b) of this title."

Court's satisfaction that his omission in failing to pay overtime compensation was done in good faith reliance that he had reasonable grounds to believe such omission was not in violation of the Fair Labor Standards Act.

■ Under the factual circumstances which gave rise to the case at bar, this Court does not feel that liquidated damages are appropriate. The fact that the Defendant enterprise was a small family-type drug store and the close knit relationship that existed between Anna Mae Rau and Nathan Darling, strongly mitigates against any wilful disregard of the provisions of the Act. Additionally, the bonuses that were paid, although not found by this Court to be credits toward overtime, are, nevertheless, further evidence of the good will that was present during most of the period in question. Of course, the existence of good will does not necessarily comport with good faith compliance with the Fair Labor Standards Act, but, taken in consideration with all the evidence in the case, the Court is satisfied that Darling's desired Rau to receive adequate compensation for her very valuable services and devotion to the store. Therefore, the Court concludes that the Defendant's omission was based on a good faith belief that it was not violating the provisions of the Fair Labor Standards Act, and we do not hold the Defendant liable for liquidated damages.[8]

## ATTORNEY FEES

■■ The Defendant is required to pay, in addition to the overtime compensation due, a reasonable attorney's fee and the costs of the action. 29 U.S.C. § 216(b). Factors to be considered in arriving at a fair award for attorney's fees are: the amount of the overtime compensation award, the nature and complexity of the issues involved, and the efforts of the Plaintiff's counsel in obtaining the award. The amount of counsel fees to be awarded rests within the sound discretion of the District Court. Hodgson v. Miller Brewing Company, 457 F.2d 221, 228 (7th Cir. 1972); Bable v. T. W. Phillips Gas and Oil Company, 287 F.2d 21, 25 (3d Cir. 1961).

The Act provides this amount to be paid to the Plaintiff so that she will be reimbursed to the extent of the award for any private fee arrangement which may exist. Thus, the Act safeguards against the possibility of the attorney receiving a double fee. The Plaintiff is protected since her liability under any private fee arrangement is ameliorated to the extent of the award for attorney fees. Houser v. Matson, 447 F.2d 860, 863–864 (9th Cir. 1971).

No evidence on the reasonable value of the services rendered to Plaintiff Rau was offered at trial. It shall therefore be necessary to hold an evidentiary hearing on this matter. (Estien v. Christian, 507 F.2d 61 (3d Cir., filed Jan. 2, 1975).

## DEFENDANT'S COUNTER-CLAIM

In addition to the defenses contained in the Answer filed by Darling's Drug Store, there was also included a Counterclaim for compensatory damages allegedly resulting from "the removal of merchandise by the Plaintiff and for monies received by the Plaintiff and not otherwise accounted for to the Defendant."

While the Counterclaim was pleaded, it was not otherwise proved, or briefed, or argued to the Court at the time of trial, and will, therefore, be denied.

---

8. A substantial question appears to exist with regard to whether defendants in Fair Labor Standards Act cases are liable for interest on unpaid overtime compensation. The rule of this Circuit appears to answer the question in the negative, but since no claim for interest was made, we do not reach this issue. See, Landaas v. Canister Co., 188 F.2d 768, 772 (3d Cir. 1951); cf.

McClanahan v. Mathews, 440 F.2d 320, 325 (6th Cir. 1971); Hodgson v. Robert Hall Clothes, Inc., 326 F.Supp. 1264, 1267 (D. Del.1971); Shultz v. Wheaton Glass Co., 319 F.Supp. 229, 236 (D.N.J.1970); Hodgson v. American Can Company, Dixie Products, 317 F.Supp. 152, 159–160 (W.D.Ark. 1970); see also, Annot., 17 A.L.R.Fed. 343 (1973).

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter of this action which was brought under the provisions of the Fair Labor Standards Act of 1938, as amended. 29 U.S.C. § 201 et seq.; 28 U.S.C. § 1337.

2. The Plaintiff was not employed in an exempt capacity as defined within the Act. 29 U.S.C. § 213(a); 29 C.F.R. § 541.

3. The Defendant is liable to the Plaintiff under 29 U.S.C. § 216(b) in the amount of $3,981.12, for overtime compensation for the years 1972 and 1973.

4. The Defendant is not liable to the Plaintiff for liquidated damages under 29 U.S.C. § 216(b); 29 U.S.C. § 260.

5. The Defendant is liable to the Plaintiff under 29 U.S.C. § 216(b) for a reasonable attorney's fee which shall be determined at a later date.

6. The Plaintiff is not liable to the Defendant for any amount under the Defendant's Counterclaim.

7. The Defendant is to pay the costs of this action.

An appropriate Order will be entered.