**Michael STURM, et al., Plaintiffs,**

v.

**TOC RETAIL, INC., d/b/a Majik Market, Defendant.**

**Civ. A. No. 93–329–1–MAC (WDO).**

United States District Court,
M.D. Georgia,
Macon Division.

Oct. 4, 1994.

John A. Draughon, Michelle Wilkins Johnson, Macon, GA, for plaintiffs.

John E. Thompson, Frasure Kytle Frye, III, Atlanta, GA, for defendant.

### ORDER

OWENS, Chief Judge.

Before the court is defendant's motion for partial summary judgment, through which defendant asks the court to find that plaintiffs, after being respectively appointed to the position of store manager, were "executives" within the meaning of 29 U.S.C. § 213(a)(1). Plaintiffs in this case seek to hold defendant, the owner of a convenience store chain, liable for violations of the overtime provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207. If the plaintiffs did indeed become "executives," defendant would be exempt from that point forward from compliance with the overtime provisions of the FLSA. After careful consideration of the arguments of counsel, the relevant caselaw, and the record as a whole, the court issues the following order.

### MATERIAL UNDISPUTED FACTS

Plaintiffs, Michael and Violet Sturm, were employed by defendant, Majik Markets, a

convenience store chain. They were hired, respectively, in October and November 1991 as manager trainees. By February 1992, both had been promoted to the position of store manager.[1] (Plaintiff's Brief in Opposition, at 3). Violet Sturm was terminated in May 1992, and Michael Sturm resigned in April 1993. (*Id.*). The following facts found by the court are based on occurrences that took place during the Sturms' respective terms as store managers for Majik Markets.

Majik Market store managers performed the initial screening process for job applicants, and enjoyed the initial exercise of discretion insofar as which applications to forward to the immediate supervisor. (Deposition of Michael Sturm, at 92). As the first filter in the hiring process, store managers necessarily made judgment calls when performing the screening duty, since only those applications satisfying the reference requirement were forwarded to the supervisor. (*Id.*). Charged with the duty of checking an applicant's background references, Michael Sturm would occasionally reject an application by simply inspecting the application on its face. (*Id.* at 93–94). Michael Sturm also conducted interviews occasionally. (*Id.* at 92). The store manager was therefore the first management hurdle over which a would-be employee was required to leap.

Once an employee was hired, Michael Sturm attempted to spend some time overseeing a new employee's work on the register, and he would spend time with them going over the "Majik Market do's and don't do's." (*Id.* at 117). If an employee were to do something wrong, Michael Sturm would correct them. (*Id.* at 118). And store managers would ensure that new company policies were promptly distributed among the store clerks. (*Id.* at 98). Even when store managers were not explicitly training their new employees, they were leading by example: employees would learn certain tasks by watching their manager perform them. (Deposition of Violet Sturm, at 67–68). If the store manager did not have the time to train the new hire themselves, they would ensure that another employee took the time to re-view procedure with them. (*Id.* at 107). It was the store manager's responsibility to ensure that new employees received proper training. (*Id.*)

A Majik Market store manager was also responsible for evaluating the performance of his employees. (M. Sturm, at 120; V. Sturm, at 117). A prerequisite to receiving a raise was for an employee to have good evaluation reports by her store manager. (V. Sturm, at 119). Supervision of an employee's work habits was a necessary prerequisite to completing an employee evaluation. (M. Sturm, at 122). Based upon his personal observation of his employees, Michael Sturm evaluated their performance. (M. Sturm, at 121–22).

The methods utilized to evaluate employees who worked different shifts from the store managers varied, but were sufficiently trustworthy to gain upper management's reliance. (M. Sturm, at 128–30). "Baiting" the register drawer with extra cash was one technique used by store managers to evaluate employee honesty. (*Id.* at 99). Store managers also reviewed the previous shift's checklist to determine if they had completed their assigned tasks. (M. Sturm, at 113–114; V. Sturm, at 94–95). Another method for supervising an employee's work was to review the "shift sales analysis," a form completed by the manager reviewing each employee on each shift. (*Id.* at 60). This report was valuable insofar as it aided in the detection of possible employee thievery. (*Id.* at 61–62; M. Sturm, at 151–53). It also enabled a store manager to review an employee's performance without actually looking over the employee's shoulder (or reviewing one of the surveillance tapes). Michael Sturm reviewed the number of hours per week worked by each employee, thus ensuring no one had signed on for a shift they had in fact not worked. (M. Sturm, at 110). And, he would discuss tardiness with any offenders. (M. Sturm, at 122–23). Every facet of a clerk's performance as a Majik Market employee was covered by a store manager's evaluation. Completion of such an evaluation is testimony to the fact that the

---

1. The facts as found by the court will in most instances refer generically to the position of "store manager" since that was the position held by both plaintiffs.

evaluator had become extremely familiar with the subject's work habits through supervision. (M. Sturm, Defendant's Exhibit # 5). Once an evaluation was completed, the store manager would discuss it with the employee. (M. Sturm, at 122; V. Sturm, at 118–119). On at least one occasion, Michael Sturm recommended one such employee for a promotion. (M. Sturm, at 123). Violet Sturm would voice criticisms of employees to her supervisor. (V. Sturm, at 122). And on one other occasion, Michael Sturm informed an employee of his termination. (M. Sturm, at 128).

A store manager ensured that the store operated smoothly on a day-to-day basis. He or she would be in charge of, among other things, ordering groceries, reviewing daily shift reports, filling out deposit slips, making deposits, distributing corporate memoranda, handling customer complaints, employee discipline, scheduling of employees [2] (including when an employee would get a day off, and if shift swaps were approved), holding store meetings with his employees, weekly bookkeeping, and reviewing shift sales analyses to detect thieves. If something in addition to those tasks contained on the checklist needed to be done, Michael Sturm would leave a note to the oncoming shift explaining what he wanted done. (M. Sturm, at 156). These duties were the exclusive province of the store manager, and not the duties of clerical employees. Violet Sturm stated that only a manager could do paperwork, (V. Sturm, at 76), and were the only persons who could check in grocery vendors. (Id. at 80). The only time a clerk performed any of these duties was when Michael Sturm was "snowed" with other work. (M. Sturm, at 149–50). Even so, such occasions were rare.

The store manager was the first notified if anything went wrong at the store during his or her absence. (M. Sturm, at 86). Store clerks had the Sturms' home number in case of a problem. Eighty percent of the calls to Michael Sturm at home from the second and third shift were related to equipment failure.

(Id. at 83). Violet Sturm would call to check on things when she was not there. (V. Sturm, at 138). Examples of equipment failures included coolers malfunctioning, air conditioners breaking, broken ice cream freezers, faulty fountain machines, and security camera malfunctions. (M. Sturm, at 86). In addition to being able to perform all of the functions of a normal clerk, a store manager had to be well-versed in how store equipment functioned. Michael Sturm received training in repair of certain store items. (Id. at 82). If there was something he could not repair himself, Michael Sturm would contact his superior for the name of a repairman to use, contact that person, and meet them at the store. (Id.). Although Violet Sturm had no such training, it was nevertheless her responsibility to contact a repairman, be at the store to receive him, and see that the repair was accomplished. (V. Sturm, at 137–38, 141).

Although their daily routines were largely planned for them in great detail by upper management's policies and procedures, store managers continued to be confronted with the hundreds of decisions that accompany the operation of a convenience store. As previously mentioned, store managers decided how much of a product to order based on the previous week's sales. (M. Sturm, at 135; V. Sturm, at 131–32). Correctly estimating these amounts was of vital importance to the store's financial success, as it ensured maintenance of profit margins. (V. Sturm, at 41–42). Michael Sturm was allowed to order and stock, per his suggestion to his superiors, a brand of beer that was not listed as an item pre-approved by upper management. (M. Sturm, at 140). He also ordered cleaning products that were similarly not preordained. (Id. at 139–40). It was his suggestion regarding price cutting on damaged goods that was accepted. (Id. at 137–38, 141–42). And it was the store manager, not a preordained list or a store clerk, who decided each week how many of a particular item to order based on the previous week's sales.

---

2. A store manager could schedule 120 man-hours per week, in addition to the time he or she worked. (M. Sturm, at 95). The manner in which these hours were scheduled was of the utmost importance, since upper management did not want to have any employee scheduled with overtime hours. (V. Sturm, at 74).

(M. Sturm, at 135; V. Sturm, at 131–32). Again, it was the Sturms' position to make these lower level management decisions—not a clerk's job. (V. Sturm, at 98).

Store managers also participated in lower level management conferences. On several occasions, Michael Sturm attended meetings with upper management in Atlanta, and on several others met locally with other store managers. (M. Sturm, at 69). Violet Sturm attended interviewing and progressive discipline seminars, as well as inventory control seminars—at both only managers were in attendance. (V. Sturm, at 29–31). Michael Sturm also possessed, as a store manager, an understanding of the defendant's policies. (M. Sturm, at 115). Violet Sturm was similarly possessed of such an understanding—she and the other store managers would discuss company policy and procedure at regular, locally held manager meetings. (V. Sturm, at 33). Michael Sturm viewed himself as a part of management, as did those who worked under him at his store. For example, when asked about the clerks at his store, he refers to them as "they"—not "we" and not "us". (M. Sturm, at 95–96). The context in which he makes this reference convinces the court that Michael Sturm viewed the clerks as employees, and himself as a part of management. The employees shared this outlook.[3] When one employee wondered why an anticipated raise failed to appear on her paycheck, she approached Michael Sturm with her problems. (M. Sturm, at 125). Store managers were also charged with the responsibility of terminating people. (*Id.* at 128). Finally, Michael Sturm even referred to himself as being in "management." (*Id.* at 154).

## DISCUSSION

### I. General Rules of Law

For the defendant to attain exempt status in this case, it must prove that the Sturms were "executives" as that term is used in 29 U.S.C. § 213(a)(1). The parties are in agreement that, to determine whether an employee is an "executive," the "short test" set forth

at 29 C.F.R. § 541.1(f) governs in this case. Under the short test, an employer must prove that (1) management was the employee's primary duty, and that (2) the employee regularly and customarily directed the work of two or more employees.

■ Several regulations provide guidance in the application of the short test. Title 29 of the C.F.R., section 541.102 describes what are considered "management" functions, while § 541.103 speaks to whether an employee's duty to manage constitutes the "primary" aspect of his job. Section 541.105 discusses what will satisfy the "two or more employees" supervisory requirement, and the regulations are silent on which actions qualify as "directing the work" of another. To the extent that the regulations are not suited to application in a certain context, courts will refer to common sense to answer issues before them.

### II. Management

■ According to § 541.102(b), the following types of work are considered managerial: "[i]nterviewing, selecting, and training of employees ...; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; determining the techniques to be used; apportioning the work among the workers; [and] determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold...." In addition to these, the First Circuit Court of Appeals has found that "[t]he supervision of other employees is clearly a management duty." *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir.1982). Although several other factors are listed, the court finds that not all factors need be present to sustain a finding that an individual was engaged in "management." *Cf. Donovan*, 672 F.2d at 226 (employee found to be manager despite lack of exercise of discretion); *Horne v.*

---

**3.** One factor that most courts have overlooked in construing the term "executive" is the perspective of the employees purportedly managed by this individual. Specifically, do other employees view the person as holding a position of authority over them?

*Crown Central Petroleum, Inc.*, 775 F.Supp. 189, 190 (D.S.C.1991).

Michael Sturm was entrusted with the initial stages of the interviewing and hiring process. For example, he was given the responsibility of conducting a background check on an applicant's references. Michael Sturm necessarily made "judgment" calls when evaluating feedback on reference checks, since he would forward to his immediate superior only those applications which satisfied the reference requirement. In fact, Michael Sturm screened out certain applications without performing reference checks, based simply upon the face of the application. Moreover, Michael Sturm admitted that he would conduct interviews himself. Violet Sturm also had discretion in the initial screening of applicants. It was understandable that the defendant would entrust her with such a responsibility, since they had her attend a seminar on interviewing techniques. It matters not that the final decision in most cases was made further up the "chain of command." The Sturms were the first management hurdle over which a would-be employee was required to leap.[4]

The Sturms were also involved in the training of new employees. Michael Sturm would review the Majik Market "do's and don't do's" with new employees, in addition to spending time with a new hire on the register. He would also ensure that new company policies were disseminated among the clerks. If he saw one of the new hires violating company policy, he would correct them. Mrs. Sturm also trained new employees, and if she did not have the time to do it,

would ensure that another clerk took care of the training.

The plaintiffs seem to suggest that since other clerks trained new hires as well, plaintiffs cannot be classified as managers. It is true that the plaintiffs were not always the ones who actually trained new hires; however, it is apparent from the deposition testimony that they were the persons responsible for having the new hires trained. Who did the "actual" training of new hires is of less importance for purposes of our inquiry than who was "responsible" for seeing that it was in fact accomplished. "Ensuring that company policies are carried out constitutes the 'very essence of supervisory work.'" *Donovan*, 672 F.2d at 226 (quoting *Anderson v. Federal Cartridge Corp.*, 62 F.Supp. 775, 781 (D.Minn.1945)). The Sturms were performing management tasks whenever they ensured that the task of training new employees was accomplished.[5]

The Sturms were also charged with the responsibility of conducting performance evaluations on employees. Based on these evaluations, the Sturms could recommend that an employee be either terminated or promoted. Although the Sturms could only recommend that an employee be terminated, they had the duty of notifying that employee once he was fired. Employees do not expect notice of termination to be delivered to them by a co-*worker*. They expect to learn this type of news from their "superior."[6]

The Sturms were also the first managerial level for employee discipline. Despite the fact that no action could be taken against an

---

**4.** In all cases, there will be an indeterminate link in the chain of command, above those who *exclusively* perform menial tasks, at which point individual workers begin to exhibit the characteristics of management. The foremost of these characteristics is the fact that employees feel bound to "report to" this person—they see this person as their "boss," the person to whom they immediately answer. This is not to say that all persons considered "bosses" by their fellow workers are per se "management", but it is difficult to imagine a situation where this would not be the case. As the first "management" link in the "chain of command," the Sturms ensured that company policy was carried out. This characterization is consistent with nearly all aspects of the Sturms' employment.

**5.** The Sturms were responsible for making sure that all tasks were completed as necessary. For this, they were allowed to schedule up to 120 hours per week for other workers. Of course, if everything were not completed within 120 manhours of work per week, the evaluation of the Sturms' performance would reflect this. Thus they had the incentive to manage the store in an effective manner. The court mentions this fact to rebut plaintiff's attempt at distinguishing *Horne v. Crown Central Petroleum, Inc.*, 775 F.Supp. 189 (D.S.C.1991), wherein the store manager received bonuses for store performance.

**6.** *See supra* note 3.

employee without first reporting the incident to upper management, there nevertheless remained the initial decision by the Sturms of whether to report any misconduct at all.

Michael Sturm on one occasion was allowed to stock a brand of beer, per his suggestion to upper management, that was not on the list of preordained items given him. He also suggested ordering a specific type of cleaner, and was allowed to do so. Finally, it was Michael Sturm, not a list preordained by upper management or another clerk, who made the weekly decisions of how many items to purchase based upon the totals of the previous week's sales. And it was Michael Sturm whose recommendation was accepted regarding the price-cutting on damaged goods.

The caselaw also supports the conclusion that the work performed by the Sturms constituted management. In *Donovan*, the First Circuit reversed the district court's denial of defendant-employer's motion for summary judgment, stating: "The fact that Burger King has well-defined policies, and that tasks are spelled out in great detail, is insufficient to negate [the conclusion that the supervision of other employees is clearly a management duty]." And as to the plaintiff's claim that his lack of discretionary powers prevented his categorization as a manager, the court in *Donovan* replied that the ability to exercise discretion, although explicitly a factor in the "long test," was not a consideration when the "short test" applied, as it does here.

Plaintiffs here claim that their work, like the managers in *Donovan*, was constrained by the strict policy guidelines and procedures implemented by the defendant. Plaintiffs also continually note that this resulted in the lack of discretion on their behalf. *Donovan* makes it clear for this court that, even if true, neither contention is entitled to any weight.[7]

One must ask himself, were Michael and Violet Sturm not at the initial level of the management process? Were they not charged with the responsibility of ensuring that everything ran according to company policy at the store, even when they were not physically present?[8] They were, and because of it they were "executives."

### III. Primary Duty

■ Plaintiffs contend that their performance of non-exempt duties was so substantial as to preclude a finding that management was their "primary" duty. This is false. One can manage while at the same time performing non-exempt tasks normally assigned to clerks. *Donovan*, 672 F.2d at 226. As the court in *Dole v. Papa Gino's of America, Inc.*, 712 F.Supp. 1038, 1043 (D.Mass. 1989), noted, "chain restaurants are routinized to the point of requiring minimum oversight for internal operations. Managers on the scene performing largely non-exempt tasks nevertheless may still have management as their primary duty."

Indeed, the demands of this particular enterprise (a convenience store) made it necessary for managers to perform exempt and non-exempt work simultaneously, much like the assistant managers in *Donovan*. Similar to the fastfood enterprises in *Donovan* and *Papa Gino's*, convenience stores are standardized departments, designed so that profitability is necessarily dependent upon maximizing utility of man-hours: if there is to be a manager, he or she must perform non-exempt work whenever not involved in the execution of exempt duties (and, indeed, often times perform non-exempt work simultaneously with exempt work).

Section 541.103, describing the method by which we should determine "primary duty," contemplates the possibility that one might be an "executive" and nevertheless perform a substantial amount of non-exempt work:

---

7. Curiously, plaintiffs have failed to refer to the *Donovan* case, even for the purpose of distinguishing it. Plaintiffs do, however, cite *Brock v. Phillips & Munzel d/b/a Ruskin Shell Food Mart*, 1986 WL 6849, 27 Wage & Hour Cas. (BNA) 935 (M.D.Fla.1986), for the proposition that convenience store managers are not exempt as "executives." However, the court in *Brock* utilized the

"long test" in reaching its conclusion. The court does not consider *Brock's* reasoning persuasive when confronted with a "short test" case.

8. As noted elsewhere in this opinion, the Sturms were always called at home *first* if something went wrong while they were not there.

"Time alone, however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion." Plaintiffs' argument is driven by their view that percentage-based tests determine which duty is "primary." In this case, the court does not share that view.

█ In deciding whether the employee's duty to manage is "primary," this court is impressed by the First Circuit's opinion in *Donovan.* There, the court read "primary" as meaning " 'principal' or 'chief' ", not "over one-half." *Donovan,* 672 F.2d at 226. In rejecting a bright-line fifty-percent rule, the court recognized the fact that percentage-based tests for determining whether management was "primary" were, like the exercise of discretion factor, part of the "long test," but not part of the "short test." *See* 29 C.F.R. § 541.1(e). In the context of a convenience store, where the "short test" applies, the court holds that percentage-based tests have no application.

Having rejected percentage-based rules, the court must ascertain the standard by which "primary duty" is to be determined. Section 541.103 lists several factors used for determining whether management is an employee's primary duty when the facts are not conducive to the application of a bright-line test. Those factors include "[1] the relative importance of the managerial duties as compared with other types of duties, [2] the frequency with which the employee exercises discretionary powers, [3] his relative freedom from supervision, and [4] the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor." Rather than applying the factors, however, we can reach the same conclusion in most cases by simply deciding if the employee was "in charge." *Donovan,* 672 F.2d at 226–27 (citing *Rau v. Darling's Drug Store, Inc.,* 388 F.Supp. 877 (W.D.Pa.1975)).

It is this court's judgment that the Sturms were, respectively, "in charge" of the stores they managed. The court in *Donovan* summarized *Rau v. Darling's Drug Store, Inc.,* 388 F.Supp. 877 (W.D.Pa.1975), as follows:

[The court in *Rau* ] held that an employee who was "in charge" of a drug store (excepting the prescription department) had management as her primary duty. This was so in spite of the fact that she was also the sole sales clerk in two departments, and did a considerable amount of routine, non-exempt work ("more than fifty percent of her time was taken up with sales clerk work"). Moreover, she was unable to make any significant or substantial decisions on her own: the owner of the store made them all, including setting prices and wages. [*Rau* ] is well-reasoned support for the proposition that the person "in charge" of a store has management as his primary duty, even though he spends the majority of his time on non-exempt work and makes few significant decisions.

*Donovan,* 672 F.2d at 226–27 (footnote and citations omitted).

The following facts have persuaded the court to find that the plaintiffs were "in charge." If any problem arose, whether it be a cooler malfunction, an air conditioning problem, a broken ice cream freezer, a faulty fountain machine, a customer complaint, a security camera malfunction, employee behavior, or any other of the myriad problems that might arise in the course of operating a convenience store, the first to be notified was the store manager. Store managers were also responsible for fulfilling shift requirements, and keeping overtime payments to a minimum. Thus they had control over who worked which shifts. Michael Sturm was also responsible for being at the store to receive repairmen whom he would contact. Without the Sturms to perform these functions—taking care of receipts, placing orders, keeping the books, repairing equipment, making deposits, all the functions mentioned above, and generally ensuring that store operations were running smoothly—the stores would not have been able to function.

## IV. Directing the Work of Two or More Employees

█ By requiring that an "executive" direct the work of two or more employees, the FLSA regulations impose a requirement that the executive act as a supervisor. *Donovan* defined supervision as "[e]nsuring that company policies are carried out." An alterna-

**1354**

tive interpretation—the one proposed by plaintiffs—would require the "supervisor" to "eyeball" those he is supervising. The court finds the former to be the more well-reasoned.[9]

▇ Plaintiffs were supervisors, even though not there with employees all the time; they ensured that, even when they were not there, company policy was being carried out. As mentioned above, the Sturms could schedule, in addition to their own work shifts, 120 man-hours per week. Because the Sturms were always "on call" if a problem were to arise, and since the Sturms would review the performance of the previous shift, it is this court's judgment that the supervisory requirement was met. Although the Sturms may not have been physically present while other employees manned the store, they would ensure when they arrived that the previous shift had in fact performed its duties. They would also review shift sales analyses to determine if employees were stealing. Most importantly, the court is of the opinion that the power to evaluate another's performance is the equivalent of supervising that individual.

Plaintiffs construct their argument, however, on the theory that for the supervisory requirement to be met, the manager must have physically supervised eighty man-hours per week. Plaintiffs would thus require a manager to "eyeball" eighty man-hours of work per week to qualify for the "executive" exemption. This is inconsistent, however, with the First Circuit's interpretation. *Donovan* found that supervision was "[e]nsuring that company policies are carried out." One need not be present for this to occur.

### CONCLUSION

Out of a group of employees, all of them workers, one must be given the responsibility for the group's oversight. Having been given such responsibility, that worker has

ceased being an Indian and is now a Chief. Of course, situations do exist where the "chief" employee is that in title only. The factors provided by the guidelines will force such a result when that is the case. However, I cannot say that this employee was a "chief" in title only, nor do the guidelines lead to such a conclusion. Under the totality of the circumstances, when considered in light of the caselaw, the guidelines as they apply in this context, and the "chain of command" rationale, the only conclusion is that the Sturms did indeed become "executives" under the FLSA after their promotion to store manager, and thus defendant's motion must be **GRANTED**.[10]

**SO ORDERED.**

▇▇▇▇▇▇▇▇

---

9. The plaintiffs' test is unsuited to many fact situations. The convenience store context is one such situation. Those engaged in the convenience store industry should not be punished because of a supervisory test that never contemplated the ability to supervise another from a distance. Supervision is the equivalent of oversight—ensuring that tasks assigned to subordinates are carried out to a level of satisfaction. Leaving a note with instructions, and inspecting

the results the following day, is a perfect example. And this is exactly what Michael Sturm would occasionally do.

10. The court only addresses the question of whether the Sturms were "executives" under 29 U.S.C. § 213(a). It was not necessary to reach any other questions raised by the parties.