NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0383n.06

No. 22-3856

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 17, 2023
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| TROY MANTEUFFEL, | ) |
|     Plaintiff-Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| HMS HOST TOLLROADS, INC, | ) |
|     Defendant-Appellee. | ) |
| | ) |
| | ) |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

OPINION

Before: MOORE, McKEAGUE, and MATHIS, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge**. Troy Manteuffel was a district director of operations for HMS Host Tollroads, Inc. ("Host") for a little over one year, overseeing the operations of several travel plazas along the Ohio Turnpike. He alleges that, while he was employed by Host, he worked in excess of forty hours a week and was not paid overtime in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207. In the district court, Host contended that Manteuffel qualified for both the executive exemption and the administrative exemption to the FLSA overtime provisions. The district court found that Manteuffel qualified for the executive exemption as a matter of law and granted summary judgment to Host. We **AFFIRM** the judgment of the district court.

**I. FACTS AND PROCEDURAL HISTORY**

Host operates restaurants and shops in airports and travel plazas, including travel plazas along the Ohio Turnpike. R. 19-2 (Jones Decl. ¶¶ 4–5) (Page ID #138). To run these travel plazas,

Host employs hourly front-line employees, including baristas, cashiers, and cooks; hourly supervisors; nonexempt assistant managers; and exempt, salaried managers and multiunit managers. *See* R. 19-2 (Jones Decl. ¶ 14) (Page ID #140); R. 21-3 (Migliori Dep. Tr. at 9:19–10:4) (Page ID #520–21). Each multiunit manager is responsible for overseeing the restaurant operations at a pair of plazas on the turnpike. *See* R. 19-2 (Jones Decl. ¶¶ 7–8) (Page ID #139). These multiunit managers report to a district director of operations, who is responsible for overseeing the operations of multiple travel plazas. *Id.* ¶ 9 (Page ID #139). The district directors of operations report to the senior director for roadway operations. R. 21-3 (Migliori Dep. Tr. at 10:25–11:2) (Page ID #521).

From July 2018 to August 2019, Host employed Troy Manteuffel as a district director of operations. R. 19-2 (Jones Decl. ¶ 10) (Page ID #139). He received a $75,000 annual salary. *Id.* ¶ 13 (Page ID #139); R. 19-3 (Manteuffel Dep. Tr. at 46:15–17) (Page ID #163). When Manteuffel began his employment at Host, five plaza managers reported to him. R. 19-3 (Manteuffel Dep. Tr. at 74:22–24) (Page ID #175). Host reorganized its operations in November 2018 and consolidated its plaza manager positions into multiunit manager positions, after which three multiunit managers reported directly to Manteuffel. *Id.* at 75:10–76:7 (Page ID #177). The other district director of operations was Dan Sedlak, who was hired around the same time as Manteuffel. R. 21-1 (Sedlak Dep. Tr. at 6:7–8; 6:22–23) (Page ID #492). Sedlak and Manteuffel each reported to Mike Migliori, the senior director for roadway operations. R. 21-1 (Sedlak Dep. Tr. at 13:21–23) (Page ID #493); R. 19-3 (Manteuffel Dep. Tr. at 50:7–8) (Page ID #165).

The principal issues in this case center around Manteuffel's duties and responsibilities as deputy director of operations. Manteuffel testified that he was responsible for "ensur[ing] that the

day-to-day operations were being taken care of" for the travel plazas. R. 19-3 (Manteuffel Dep. Tr. at 73:14–16) (Page ID #174). District directors of operations are responsible for dealing with labor costs and budget constraints for their plazas; performing walkthroughs of the plazas; analyzing regular cost reports; reviewing sales, hours, labor, overtime, and waste reports; meeting with managers to ensure that they are meeting expectations; and training and coaching lower-level employees. R. 21-3 (Migliori Dep. Tr. 14:19-16:13) (Page ID #522); R. 19-3 (Manteuffel Dep. Ex. 19 at 1–2) (Page ID #286–87); R. 19-3 (Manteuffel Dep. Ex. 23 at 1-2) (Page ID #290–91). Manteuffel's job involved making sure that lower-level employees had plans for how to meet sales and hours targets, improving staffing and cleanliness levels at the plazas, ensuring that lower-level employees were trained to work at the various restaurants, and recommending employees for promotion. R. 19-3 (Manteuffel Dep. Tr. at 79:2–22; 82:6–21; 100:2–101:9; 102:12–105:7; 139:1–16) (Page ID #180, 182, 193–94, 195–97, 216). District directors of operations also interview, hire, and fire lower-level employees and participate in the hiring process for their direct reports, Host's multiunit managers. R. 21-1 (Sedlak Dep. Tr. at 55:23–56:7) (Page ID #504); R. 19-3 (Manteuffel Dep. Tr. 86:18-87:2) (Page ID #185–86); R. 19-3 (Manteuffel Dep. Ex. 23 at 2) (Page ID #291); R. 19-7 (Executive Examples at 3, 4, 8, 22, 27, 29) (Page ID #373, 374, 378, 392, 397, 399).

Manteuffel testified that in addition to performing this type of work, he also effectively served as an hourly nonexempt employee at the various food-service "concepts" at the travel plazas he was responsible for overseeing, which included a Starbucks, KFC, Pizza Hut, and Burger King, among others. *See* R. 19-3 (Manteuffel Dep. Ex. 23 at 2) (Page ID #290–92). He testified that he spent approximately eighty to ninety percent of the workday performing hourly, nonexempt work.

3

R. 19-3 (Manteuffel Dep. Tr. at 172:18–21) (Page ID #231). Joseph Walls, an assistant manager at one of the Host travel plazas, testified that he saw Manteuffel at the Burger King in his travel plaza approximately once or twice a week, and Walls often saw Manteuffel running the register, preparing food, and restocking. R. 21-2 (Walls Dep. Tr. at 13:14–14:16) (Page ID #511–12). He stated that it was typical for Manteuffel to perform such tasks when he was there. *Id.* at 14:7–14:16 (Page ID #512). Walls also testified that he saw Manteuffel loading or unloading trucks on more than one occasion. *Id.* at 15:22–16:8 (Page ID #512). Another manager at Host, Heather Windsor, testified that she had worked with Manteuffel cooking and stocking at Burger King, Pizza Hut, and KFC two or three times each, that he had served customers with her at Pizza Hut and KFC approximately twenty times each, and that she had seen him bring inventory up from the basement of the plaza two or three times. R. 21-4 (Windsor Dep. Tr. at 14:6–20:9) (Page ID #541–42). Windsor testified that she had seen Manteuffel performing these kinds of tasks only "[e]rratically, an hour here, an hour there." *Id.* at 28:3–11 (Page ID #544).

In May 2019, Host placed Manteuffel on a performance improvement plan. R. 19-3 (Manteuffel Dep. Tr. at 177:4–22) (Page ID #235). Several months later, in August 2019, it terminated his employment. *Id.* at 226:17–20 (Page ID #254). He subsequently filed a lawsuit in the Lucas County Court of Common Pleas alleging violations of the FLSA and the Ohio Minimum Fair Wage Standards Act, among other claims. R. 1-1 (Compl. ¶¶ 33–44) (Page ID #15–17). Host filed a notice of removal on December 18, 2019. R. 1 (Notice of Removal at 1) (Page ID #1).

After discovery concluded, Host filed a motion for summary judgment. R. 19 (Mot. for Summ. J. at 1–2) (Page ID #84–85). Host argued that Manteuffel was covered by both the executive and the administrative exemptions to the FLSA overtime provisions. R. 19-1 (Br. in

Supp. of Mot. for Summ. J. at 10, 25) (Page ID #104, 119). The district court granted the motion for summary judgment, finding that Manteuffel was an executive employee exempt from the FLSA overtime provision as a matter of law and that no reasonable jury could find otherwise. R. 23 (Mem. Op. at 12) (Page ID #600). Both parties agreed that federal law controls Manteuffel's state overtime claim, and therefore the district court dismissed his state-law overtime claim as well. *Id.* at 5 (Page ID #593). The district court also granted summary judgment on Manteuffel's state-law prompt-pay claim because Manteuffel was entitled to recover only if he was not paid overtime wages to which he was entitled. *Id.* at 5, 12 (Page ID #593, 600). Manteuffel timely filed a notice of appeal. R. 25 (Notice of Appeal at 1) (Page ID #605).

## II. ANALYSIS

### A. Standard of Review

We review de novo a district court's grant of summary judgment. *Med. Mut. of Ohio v. K. Amalia Enters. Inc.*, 548 F.3d 383, 389 (6th Cir. 2008). We "view[] all evidence and draw[] all reasonable inferences in the light most favorable to the non-moving party." *Walsh v. KDE Equine, LLC*, 56 F.4th 409, 416 (6th Cir. 2022) (quoting *Sec'y of Lab. v. Timberline S., LLC*, 925 F.3d 838, 843 (6th Cir. 2019)). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### B. Fair Labor Standards Act

Manteuffel argues that Host violated the FLSA and Ohio's Minimum Fair Wage Standards Act by failing to pay him overtime when he worked more than forty hours per week. As the district court noted, Manteuffel's state-law claims rise and fall with his federal claims, because "the Ohio statute expressly incorporates the standards and principles found in the FLSA." R. 23 (Mem. Op. at 5) (Page ID #593) (quoting *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501

(6th Cir. 2007)). The only question before us is whether Manteuffel is exempt from the FLSA's overtime provisions.

The FLSA requires employers to pay overtime compensation to employees who work in excess of forty hours a week. 29 U.S.C. § 207(a)(1). The FLSA, however, also carves out exemptions from this rule for certain classes of workers. 29 U.S.C. § 213. Among those classes are individuals "employed in a bona fide executive, administrative, or professional capacity." *Id.* § 213(a)(1). Though Congress did not define these terms, it delegated the authority to do so to the Department of Labor. *Id.* As is relevant to this case, the Department of Labor has issued regulations clarifying when an individual is employed in an executive capacity. 29 C.F.R. § 541.100. An "employee employed in a bona fide executive capacity" is an employee who is "(1) [c]ompensated on a salary basis . . . at a rate not less than $684 per week," or $35,568 per year; "(2) [w]hose primary duty is management of the enterprise in which the employee is employed"; "(3) [w]ho customarily and regularly directs the work of two or more other employees"; and "(4) [w]ho has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a). Host bears the burden of proving that Manteuffel falls within the executive exemption. *Mich. Ass'n of Gov't Emps. v. Mich. Dep't of Corr.*, 992 F.2d 82, 83 (6th Cir. 1993) (per curiam). Until recently, courts "narrowly construed [exemptions] against the employers seeking to assert them." *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007). But in *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134 (2018), the Supreme Court held that courts must give the exemptions a "fair reading," rather than construing the exemptions against employers, *id.* at 1142; *see also*

*Holt v. City of Battle Creek*, 925 F.3d 905, 910 (6th Cir. 2019) (adopting the "fair reading" standard for the executive exemption).

Manteuffel contends that he was not employed in a bona fide executive capacity when he was the district director of operations at Host. Appellant Br. at 7. Specifically, he contests the second, third, and fourth requirements: that his primary duty was management, that he "customarily and regularly" directed two or more employees, and that he had the authority to hire or fire other employees or that his suggestions and recommendations as to hiring, firing, or changes of status for other employees were given "particular weight." Appellant Br. at 7–8.

**1. Primary Duty**

The Department of Labor has issued regulations explaining the meaning of the term "primary duty" in the executive exemption. 29 C.F.R. § 541.700. An employee's "primary duty" is the "principal, main, major or most important duty that the employee performs." *Id.* § 541.700(a). The determination is holistic, considering all the facts in a particular case, including factors like "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* While the amount of time an employee spends on exempt work can be an indicator of whether management is an employee's primary duty, the amount of time spent on exempt or non-exempt work is not determinative. *Id.* § 541.700(b). The regulations offer assistant managers in a retail establishment as an example of employees who perform exempt executive work as well as nonexempt work like staffing registers and conclude that such assistant managers may still qualify as exempt executive

employees even if they spend more than fifty percent of their time on nonexempt work. *Id.* § 541.700(c). The regulations further specify that the "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met." *Id.* § 541.106. The Department of Labor has set out a general definition of work that qualifies as "management," which includes but is not limited to:

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; . . . determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

*Id.* § 541.102.

Manteuffel contends that his primary duty was hourly nonexempt work, rather than management. Appellant Br. at 7. But even construing the facts and making all reasonable inferences in Manteuffel's favor, as we must at the summary judgment stage, the record indicates that Manteuffel's primary duty was management. The Department of Labor has made clear that time spent on management activities as compared with nonexempt activities is not determinative of whether an individual is an executive. *See* 29 C.F.R. § 541.700. We have held the same: "where an employee 'manage[s] while at the same time performing non-exempt tasks normally assigned to [subordinate employees],' . . . we refuse to give undue weight to the time factor of the 'primary duty' inquiry." *Thomas*, 506 F.3d at 504 (alteration in original) (first quoting *Sturm v.*

*TOC Retail, Inc.*, 864 F. Supp. 1346, 1352 (M.D. Ga. 1994), then quoting 29 C.F.R. § 541.103 (2003)).

The other factors to consider in connection with the primary-duty inquiry, beyond the amount of time spent on exempt work, include "the relative importance of the exempt duties as compared with other types of duties," "the employee's relative freedom from direct supervision," and "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." 29 C.F.R. § 541.700(a).[1] Accepting Manteuffel's testimony that he spent eighty to ninety percent of his time employed at Host performing nonexempt work, we proceed through the remaining relevant factors to assess whether management was in fact his primary duty, despite the claimed disparity in how Manteuffel spent his time.

### a. Relative Importance of Management Duties

We conclude that the record shows that Manteuffel's management duties were of greater importance than any nonexempt work that he performed. This inquiry requires us to "compare the importance of the plaintiff's managerial duties with the importance of [their] non-managerial duties, keeping in mind the end goal of achieving the overall success of the company." *Thomas*, 506 F.3d at 505. In *Thomas*, we determined that a gas-station manager who spent sixty percent of her time at work "stocking merchandise, sweeping floors, cleaning bathrooms, operating the register, and performing routine clerical duties," *id.* at 499, nonetheless had management as her primary duty because her responsibilities of supervising, interviewing, hiring, and disciplining

---

[1]In *Thomas*, the court also considered "the frequency with which the employee exercises discretionary powers." 506 F.3d at 505 (quoting 29 C.F.R. § 541.103 (2003)). The relevant regulation on primary duty has since been updated, and that factor is no longer listed.

employees; preparing work schedules; recommending the termination of or terminating employees; and monitoring employees' performance were "essential" and therefore "much more important to [the gas station's] success" because if she failed to perform her managerial duties, the gas station would not be able to function. *Id.* at 505–06. Here, Manteuffel's responsibilities, as he described them, included supervising and disciplining employees, hiring, directing other employees' work responsibilities, and fundamentally "ensur[ing] that the day-to-day operations were being taken care of" at the plazas he supervised. R. 19-3 (Manteuffel Dep. Tr. at 73:15–16) (Page ID #174). Even crediting his contention that he performed more nonexempt work, the evidence indicates that, like the gas-station manager in *Thomas*, his managerial duties were "much more important to [the company's] success than [his] non-managerial duties." *Thomas*, 506 F.3d at 505.

The text of the regulation on concurrent duties also supports this conclusion. The regulation states that "exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work. . . . An assistant manager can supervise employees and serve customers at the same time without losing the exemption. An exempt employee can also simultaneously direct the work of other employees and stock shelves." 29 C.F.R. § 541.106. We conclude that Manteuffel's management duties were of greater importance to Host's success than the nonexempt work he performed, even crediting his claim that he spent a significant amount of time performing nonexempt work. This factor thus weighs in favor of considering management Manteuffel's primary duty.

### b. Relative Freedom from Supervision

The next factor of the primary-duty inquiry asks whether the employee is relatively free from supervision; this factor "does not demand complete freedom from supervision, such that [an executive employee] is answerable to no one, as this would disqualify all but the chief executive officer from satisfying this factor of the primary duty inquiry." *Thomas*, 506 F.3d at 507. In *Thomas*, the employee's district manager "visited [the] store approximately once or twice a week, communicated with [the employee] frequently via phone and email, and remained constantly available to address [the employee's] concerns." *Id.* We also considered the fact that the district manager in *Thomas* oversaw ten or twelve gas stations as an indication that the local gas-station manager was "relatively free from supervision." *Id.* at 508.

The record here shows that Mike Migliori visited each of Manteuffel's six plazas once a month and communicated with Manteuffel frequently by phone and email. R. 21-3 (Migliori Dep. Tr. at 8:13–22) (Page ID #520). Migliori was responsible for overseeing all travel plazas on the Illinois, Indiana, Ohio, and West Virginia Turnpikes, which amounted to twenty-two plazas. *Id.* at 7:23–8:6; 14:12–13 (Page ID #520, 522). Manteuffel has not pointed to anything in the record to counter this evidence, and thus there is no genuine dispute of fact. We conclude that Manteuffel, like the manager in *Thomas*, "operated free from direct over-the-shoulder oversight on a day-to-day basis," which weighs in favor of the conclusion that Manteuffel's primary duty was management. *Thomas*, 506 F.3d at 508.

### c. Pay Comparison

The final factor of the primary-duty inquiry is the relationship between the allegedly exempt employee's pay and the pay of the employees who are performing the nonexempt work.

This factor also indicates that Manteuffel's primary duty was management. Manteuffel earned a base salary of $75,000 annually, plus a bonus. R. 19-2 (Jones Decl. ¶ 13) (Page ID #139); R. 19-3 (Manteuffel Dep. Tr. at 46:15–17, 216:10–15) (Page ID #163, 250). The nonexempt front-line employees earned approximately $10 per hour. R. 19-2 (Jones Decl. ¶ 14) (Page ID #140). Working a forty-hour week, fifty-two weeks a year, the nonexempt front-line employees would earn $20,800 per year; the nonexempt assistant managers would earn $34,000. *Id.* Manteuffel thus earned more than three times as much as nonexempt front-line employees and more than twice as much as nonexempt assistant managers, not including any bonus he might have received. In *Thomas*, the Sixth Circuit considered a thirty-percent difference in salary significant enough to weigh this factor in favor of finding that management was Thomas's primary duty. 506 F.3d at 509. The salary differential here is significantly greater, and thus this factor also weighs in favor of considering management Manteuffel's primary duty.

Each of these factors weighs in favor of determining that Manteuffel's primary duty was management, even if he spent most of his time performing nonexempt work. We therefore conclude that Manteuffel's primary duty was management.

### 2. Customarily and Regularly Directing Employees

The third requirement for an employee to come within the executive exemption is that the employee must "customarily and regularly direct[] the work of two or more other employees." 29 C.F.R. § 541.100(a)(3). There is no genuine dispute of material fact over whether Manteuffel customarily and regularly directed two or more employees. Manteuffel testified that he was the direct supervisor of the three multiunit managers. R. 19-3 (Manteuffel Dep. Tr. at 76:4–7) (Page ID #177). The only argument that Manteuffel makes regarding this factor is that the multiunit

12

managers set their own schedules and Manteuffel did not have the authority to set their pay rates. R. 21-1 (Sedlak Dep. Tr. at 37:16–38:8) (Page ID #499–500); R. 19-3 (Manteuffel Dep. Tr. at 74:2–5) (Page ID #175). The record shows, however, that Manteuffel completed monthly "succession plan[s]" evaluating management personnel; required plaza managers to submit schedules to him for review and approval; directed multiunit managers on expectations for how plazas should be cleaned and organized; participated in walkthroughs of plazas in which he pointed out to managers areas for improvement; and met with managers to teach them new skills and express concerns about their work performance. R. 19-3 (Manteuffel Dep. Tr. at 165:1–14) (Page ID #227); R. 19-3 (Manteuffel Dep. Exhibit 19 at 2) (Page ID #287); R. 19-3 (Manteuffel Dep. Exhibit 23 at 1–2) (Page ID #290–91); R. 19-7 (App. 1 to Host Mot. for Summ. J. at 10, 13) (Page ID #380, 383); R. 19-8 (App. 2 to Host Mot. for Summ. J. at 32) (Page ID #462). These all indicate that Manteuffel customarily and regularly directed the multiunit managers.

### 3. Hiring or Firing

The final factor that we must consider is whether the allegedly exempt employee "has the authority to hire or fire other employees or [their] suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(4). The plain text of the regulation indicates that there are two ways to satisfy this requirement: *either* the allegedly exempt employee can hire or fire other employees, *or* their recommendations as to hiring, firing, or changes of status "are given particular weight." *Id.* The precise definition of what it means for an employee's recommendations to have "particular weight" is delineated in 29 C.F.R. § 541.105, which states that when satisfying this factor through the second means, the employee's "suggestions and

13

recommendations must pertain to employees to whom the executive customarily and regularly directs." Manteuffel argues that this requirement should be imported to the first method of satisfying the test as well, and that we must consider only whether he had the authority to hire or fire his direct reports, the multiunit managers who are immediately below him in the chain of command. Manteuffel's suggested reading would strain the text of the regulation as well as its purpose; it would hardly make sense for executives who have the authority to hire or fire individuals more than one step below them in the corporate chain of command not to be considered executives merely because they cannot unilaterally hire or fire direct reports.

We conclude that Manteuffel satisfies the first condition, as he had the authority to hire or fire other employees. Host put forth significant evidence that Manteuffel both hired and fired other employees. Heather Windsor testified that Manteuffel and Migliori both interviewed her for her job as a food and beverage manager. R. 21-4 (Heather Windsor Dep. Tr. at 7:4–6) (Page ID #539). Manteuffel's emails indicate that he regularly participated in interviews and hired employees. R. 19-7 (App. 1 to Host Mot. for Summ. J. at 1, 3, 4, 8, 22, 29) (Page ID #371, 373, 374, 378, 392, 399). He also terminated lower-level employees. *Id.* at 25, 27 (Page ID #395, 397); R. 21-4 (Windsor Dep. Tr. at 29:21–30:11) (Page ID #544–45). The other district director of operations also testified that he had the authority to fire or suspend employees if there were serious problems, though HR was always involved. R. 21-1 (Sedlak Dep. Tr. at 51:22–57:22) (Page ID #503–04). Though Manteuffel testified that many of his disciplinary decisions were "predetermined," his own description of his job duties indicates he had the authority both to hire and to fire lower-level employees. R. 19-3 (Manteuffel Dep. Tr. Ex. 3 at 1) (Page ID #271).

14

### III. CONCLUSION

Manteuffel's arguments that Host has not satisfied its burden to demonstrate that he is an executive exempt from the overtime requirements of the FLSA are unavailing. Construing all the facts in Manteuffel's favor, as we must at summary judgment, we conclude that as a matter of law, Host has demonstrated that Manteuffel satisfies all the requirements in 29 C.F.R. § 541.100. First, Manteuffel is compensated on a salary basis "at a rate of not less than $684 per week." 29 C.F.R. § 541.100(a). Second, each of the factors in the primary-duty inquiry weigh in favor of concluding that Manteuffel's primary duty was management: his management duties were of relatively greater importance than his nonexempt duties, he was relatively free from supervision, and he was paid at a much higher rate than the nonexempt hourly employees. Third, the record shows that Manteuffel customarily and regularly directed the multiunit managers. Fourth, and finally, the record shows that Manteuffel had the authority to hire or fire other employees. No reasonable jury could conclude otherwise. We hold that Manteuffel is subject to the executive exemption to the FLSA overtime provision as a matter of law and therefore **AFFIRM** the district court.